[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13125

_____

D.C. Docket No. 1:12-cr-20339-RWG-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ELLIOT RIVERA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 12, 2015)

Before TJOFLAT, JULIE CARNES, and GILMAN,[*] Circuit Judges.

JULIE CARNES, Circuit Judge:

_____

[*] Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

Defendant Elliot Rivera ("Defendant") appeals his convictions for murder for hire and conspiracy to commit murder for hire, in violation of 18 U.S.C. § 1958. During a week-long jury trial, evidence was presented showing that Defendant attempted to hire a hit man to murder a person on whom Defendant held a large life insurance policy. Seeking a reversal of his conviction, Defendant argues that the district court erred in admitting tape-recorded conversations between himself and the wife of the coconspirator in this plot. Defendant also contends that the district court erred in allowing the wife to testify about her understanding of the meaning of certain parts of the taped conversations between herself and Defendant. Finally, Defendant argues that prosecutorial misconduct occurred (1) when the prosecutor asked Defendant on cross-examination whether other witnesses had lied and (2) when the prosecutor, in his closing argument, suggested to the jury that Defendant had lied during his testimony.

We find no reversible error and affirm.

## I. Background

Defendant operated a satellite dish business called All Things Digital. However he may have amassed his wealth,[1] Defendant was prosperous enough to be able to loan a large sum of money to Felipe Caldera, who later became the

---

[1] The evidence at trial indicated that Defendant was a regular purchaser of stolen equipment. In addition, he told his coconspirator that he feared an upcoming court proceeding because he would be unable to explain how he acquired the $4 million he had loaned the intended victim in this case.

2

intended victim of the murder-for-hire scheme at issue in this case. Between 2004 and 2010, Defendant loaned Caldera approximately $3.5 million as an "investment" in Caldera's business, and, during that same time period, Caldera paid Defendant approximately $14 million in interest.

Caldera required these loans from Defendant and other "investors" to operate his company, Fab Air Corporation, which sold surplus aircraft parts. In the midst of the 2007 economic recession, Fab Air hit rough times when the market for aircraft parts took a downturn. To stay afloat, Caldera began borrowing from new lenders to meet the demands of existing lenders. Ultimately, he was paying over half a million dollars in interest each month.

To repay Defendant, whom Caldera still owed $3.5 million, Caldera offered him aircraft parts that he claimed were worth over $14 million. In reality, these parts were only worth about $80,000, a fact that Defendant only learned later. Despite this significant misrepresentation, Caldera was able to persuade Defendant to loan him another $350,000 to buy new aircraft parts that the two men could then sell at a profit. But instead of buying parts, Caldera used the money to repay other disgruntled lenders. He later confessed to Defendant that he had spent the money elsewhere.

Thereafter, Defendant advised Caldera that he had heard "somebody was going to put a bullet in [Caldera's] head." Defendant explained that, while he

3

would like to loan Caldera an additional $1.5 million to start a new business, Defendant was worried that his investment—which with the new loan would top $5 million—could be at great risk, given this threat on Caldera's life.  Accordingly, Defendant suggested that Caldera take out a life insurance policy for $5 million with Defendant as the beneficiary.  Either not recognizing that he was putting a price tag on his own life or just too desperate for money to worry about that, Caldera bought a life insurance policy.[2]  At Defendant's suggestion, Caldera initially named his wife as the beneficiary and agreed that he would later assign the ownership of the policy to Defendant.  Defendant provided Caldera with the money to pay the premiums on the policy and, in February 2011, Caldera assigned the ownership of the policy to Defendant, who made his company, All Things Digital, the new beneficiary.

A little over a year later, in March 2012, Defendant made contact with Ricardo Rodriguez, whom Defendant had known for over ten years and from whom Defendant sometimes bought stolen cable equipment.  Defendant remarked that someone had stolen $4 million from him, that he was looking for someone who would kill that individual, and that, in return, Defendant would pay $100,000. Rodriguez said he did not know anyone who would do what Defendant requested.

---

[2]  In fact, Defendant never loaned Caldera the additional $1.5 million.

4

About a week later, Rodriguez was again selling stolen equipment to Defendant when Defendant encouraged Rodriguez to find a hit man for a $100,000 fee. Although Rodriguez did not agree to Defendant's proposal, Defendant gave him a new telephone number to reach him in the event that Rodriguez found someone to do the job.

Soon after this, Rodriguez was delivering stolen equipment to Defendant when Defendant yet again repeated his need for a hit man. Giving Rodriguez a subpoena issued by the bankruptcy court to the intended victim, Felipe Caldera, Defendant explained that if Caldera testified about the $4 million loan, Defendant might be asked to explain how he had been able to acquire $4 million to loan Caldera. Plus, according to Defendant, Caldera was a swindler who had used phony aircraft parts as a ploy to steal money from people. Finally, if all that wasn't bad enough, Caldera also beat his wife and children. Finally persuaded, Rodriguez agreed to find a hit man.

Rodriguez contacted a friend named "Jorge," who had previously sold Rodriguez stolen equipment and had served time in prison. Rodriguez asked for Jorge's help in finding someone to commit a murder and offered him $50,000 for the job. Jorge agreed.

Unfortunately for Rodriguez, Jorge was an FBI informant. Jorge put Rodriguez in touch with "Arturo," the "hit man" he purportedly had found. Not

5

surprisingly, Arturo was also an FBI informant. In a recorded conversation, Rodriguez told Arturo that he wanted him to kill a person who had stolen $4 million from Rodriguez's family. Arturo agreed to do the job for $50,000. Rodriguez then gave Arturo the piece of paper on which he had copied information given to him by Defendant, including Caldera's full name, a general address, and the make, model, and license plate number of Caldera's car. Rodriguez said that the plan was to summon Caldera to All Things Digital, after which Arturo would follow Caldera as he left the business, and kill him elsewhere. At Arturo's request, Rodriguez gave him the gun he had obtained for the job and agreed to deliver a $25,000 advance within the week.

Rodriguez reported back to Defendant that the hit man he had hired wanted $25,000 in advance. Defendant took, in cash, $19,000 from a box in his car and $6,000 from his pocket, and gave it to Rodriguez. Defendant told Rodriguez he would pay him the remaining $25,000 after "everything was ready," which Rodriguez understood to mean after Caldera was dead.

Later on, Rodriguez gave the $25,000 installment payment to Arturo, at which point the FBI arrested him. Rodriguez called his wife, Lucienne, told her he had been arrested, and asked her to call Defendant, explaining that Defendant was "the only one that was going to be able to help." Lucienne contacted Defendant, who pressed her as to why her husband had been arrested—a question she told him

6

she was unable to answer—but Defendant nonetheless gave her $5,000 to hire a lawyer and $1,000 to recover Rodriguez's impounded truck.

Within a few days, both Rodriguez and his wife Lucienne agreed to cooperate with the government. Thereafter, Lucienne wore a wire and recorded her conversations with Defendant. These conversations are the subject of two of Defendant's assertions of error and will be discussed in more detail below. In summary, while Defendant's comments were sometimes clipped, he eventually agreed to give Lucienne the $100,000 she demanded in exchange for her husband's silence and for her delivery of a tape recording she claimed to possess of the conversation in which Defendant had given Rodriguez $25,000 to murder Caldera. Defendant later gave Lucienne a $20,000 advance on the promised $100,000 hush money, after which she gave him the purported tape made by her husband. The FBI immediately moved in and arrested Defendant, finding papers in his truck that showed Caldera's name, former address, and license plate number, as well as Lucienne's license plate number.

## II. Standards of Review

We ordinarily review a district court's evidentiary rulings for abuse of discretion. *United States v. Dortch*, 696 F.3d 1104, 1110 (11th Cir. 2012). Where a defendant raises an evidentiary error for the first time on appeal, we review only for plain error. *United States v. Wetherald*, 636 F.3d 1315, 1320 (11th Cir. 2011).

7

Generally, we review *de novo* claims of prosecutorial misconduct.  *United States v. House*, 684 F.3d 1173, 1197 (11th Cir. 2012).  "But where a defendant fails to make a contemporaneous objection to the alleged misconduct in the district court, we review such claims for plain error."  *Id.*  To establish plain error, a defendant must show that "(1) there is an error; (2) that is plain or obvious; (3) affecting the defendant's substantial rights in that it was prejudicial and not harmless; and (4) that seriously affects the fairness, integrity or public reputation of the judicial proceedings."  *United States v. Hoffman-Vaile*, 568 F.3d 1335, 1340 (11th Cir. 2009).

### III. Discussion

A.    Hearsay

Audio recordings of four conversations between Defendant and Lucienne were admitted at trial.  Defendant concedes that any remarks he made in those conversations were admissible, but he argues on appeal that the portions of the recordings reflecting Lucienne's part of the conversation should have been excluded as inadmissible hearsay.  He did not make this objection at trial.  We conclude that the remarks of neither speaker constituted hearsay and accordingly find no error in their admission.

1.    Content of Recorded Conversations

At issue are the recordings of four conversations between Lucienne and Defendant that were admitted by the district court.[3]  During a May 6, 2012, telephone conversation, Lucienne told Defendant that her husband, Ricardo Rodriguez, had been arrested and had asked her to call Defendant because he would be able to help.  Several times, Lucienne expressed her concern that she would not be able to pay Rodriguez's attorney, and she repeatedly told Defendant how distressed she was at her husband's incarceration.  Lucienne requested to meet with Defendant in person because she did not want to discuss the reason for Rodriguez's arrest over the telephone.

At an in-person meeting later that same day, Lucienne told Defendant that Rodriguez was facing ten years' imprisonment, but she repeatedly assured him that Rodriguez was going to be "a man" about the situation and keep quiet.  Although Lucienne never told Defendant why Rodriguez had been arrested, Defendant appeared to know, without asking, because he wondered aloud how Rodriguez could be facing ten years' imprisonment if there was no victim.  Defendant later admitted to Lucienne that he had previously talked to Rodriguez about "following someone," but Defendant said that the person he had asked Rodriguez to follow

---

[3]  While the recordings were in Spanish, the jury was provided with transcripts of the conversations in both English and Spanish.  The parties stipulated that the transcripts and translations were true and correct reflections of the recorded conversations.

had likely not done anything to Rodriguez and that the person did not even know Rodriguez. Defendant also assured Lucienne that the person whom Rodriguez was supposed to follow was "fine" and "nothing" had happened to him.

On May 15, 2012, Lucienne and Defendant met in person for a second time. Lucienne revealed that Rodriguez had now told her the whole truth about "Felipe" (Caldera), but, not to worry, Rodriguez had taken the blame and he would be receiving a ten-year sentence. Elaborating on this reassurance, she recounted Rodriguez's promise to stay quiet, but also stated that Rodriguez would require something in return from Defendant. Specifically, Lucienne said, "[H]e'll keep silent; he won't mention anyone, neither you nor anyone, but that the only thing he asks from you . . . You had offered him [$100,000]." In case Defendant had not caught the drift of her remarks, she repeated, "He said you offered him $100,000, and that if you give me the $100,000 he'll keep silent and it will all end here." After Defendant initially denied giving Rodriguez anything, Lucienne responded, "[Y]ou gave him [$25,000] and he recorded it . . . . I found the recording and I have it in a safe place." This revelation appeared to jog Defendant's memory, and he then recalled that, in fact, he had loaned Rodriguez some money and assured Lucienne that he, Defendant, was a "man of [his] word." Defendant further stated that Rodriguez had "offered to do it" and that he had told Rodriguez not to do it

10

himself.  Later, Defendant told Lucienne that he could not give her all of the money at once, but he would give her $10,000 a month.

A week later, on May 22, 2012, Lucienne met with Defendant for the purpose of exchanging the tape recording she claimed to possess in return for cash from Defendant.  She gave him the purported recording of Rodriguez's conversation with Defendant.  As noted above, Defendant then gave her $20,000, and he was promptly arrested.

### 2.    Analysis

Defendant makes a rather unconventional argument.  He contends that whenever admission of a tape-recorded conversation is sought, only the statements of the party against whom the conversation is being admitted (here Defendant) can be admitted.  The statements of the other participant in the conversation (here Lucienne) are not admissible, according to Defendant, because they are out-of-court statements that should be excluded as hearsay.  If Defendant's position were correct, it would mean that, except for the criminal defendant against whom the statements are being admitted, the voice of any other participant to the taped conversation would have to be removed.  Further, any accompanying transcript of the conversation would have to redact any statements not made by the defendant.  In other words, the jury would hear only a soliloquy by the defendant, with no knowledge of the substance of any comments by others to whom the defendant was

responding.  Unable to discern the context of a defendant's remarks, a jury would almost never be able to make much sense of a defendant's statements.  In effect, Defendant's argument would cast doubt on a longstanding practice, occurring over decades and in innumerable trials, of permitting the jury to hear a taped conversation between a defendant and another person.

But Defendant is not right.  The hearsay rule may sometimes require the exclusion of particular statements that are part of a recounted conversation, whether taped or merely recalled by the witness.  But it does not operate to exclude, wholesale, remarks made by another participant to the conversation, merely because those remarks occurred outside the courtroom.  Moreover, Defendant did not even object at trial that, as a general matter, Lucienne's statements were hearsay, nor did he object to any particular statements as being hearsay.  Because Defendant asserted no objections at trial on an issue that he now raises on appeal, we review this issue for plain error.  *See Wetherald*, 636 F.3d at 1320.

Hearsay is a statement, other than one made by a declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted.  Fed. R. Evid. 801(c).  Generally, an out-of-court statement admitted to show its effect on the hearer is not hearsay.  *United States v. Cruz,* 805 F.2d 1464, 1478 (11th Cir. 1986).  "Such verbal acts are not in the first instance assertive statements and not offered

to prove the truth of the matter asserted." *Id.*  Likewise, out-of-court declarations that are "more in the nature of an order or a request" and that, "to a large degree, [are] not even capable of being true or false" are also not hearsay.  *Id.*

Defendant concedes that his own statements in the recordings were admissible under Federal Rule of Evidence 801(d)(2)(A) as statements of a party-opponent.  *See United States v. Brown*, 441 F.3d 1330, 1358 (11th Cir. 2006); *United States v. Munoz,* 16 F.3d 1116, 1120 (11th Cir. 1994) ("[A] statement is not hearsay if it is the statement of the party against whom it is offered").  As to Lucienne's statements, Defendant does not identify any specific statements as being hearsay, but simply contends that none of her statements should have been admitted because they were all made outside of the courtroom.

Nonetheless, we have reviewed the tape recording transcripts and conclude that almost all of Lucienne's statements fall into one of two categories, neither of which are hearsay:  (1) non-assertive statements that are incapable of being true or false or (2) statements that are indisputably false.  In both cases, her out-of-court declarations were offered only to show their effect on the listener:  Defendant Rivera.  This is not surprising because Lucienne's entire purpose in making the tape was to prompt Defendant to talk.  Her own statements, by themselves, were important only to the extent they provided a context to assess Defendant's

13

response.  Her statements therefore were not offered for the truth of the matters asserted.

The majority of Lucienne's statements are not hearsay because they are not "assertive" in nature.  That is, many of her statements are, "to a large degree, not even capable of being true or false."  *See Cruz*, 805 F.2d at 1478.  For example, Lucienne peppered Defendant with questions throughout the four recorded conversations, asking him things such as, "And who's Felipe?"; "Why don't you tell me what's going on?"; "Why do I have to put my purse away?  What's the problem?"; "[W]hat would [my husband] gain with all of this, buddy?"; and "[My husband went down] for being an asshole, for being stupid?"  The transcripts are also replete with short utterances by Lucienne that are part of any normal conversation, such as "Yeah"; "All right"; "You know what I mean?"; and "Oh, my God."  These questions and statements—and many others like these—are simply incapable of being true or false and thus are not hearsay.  But the jury needed to hear them to give context to Defendant's responses, which otherwise would have been no more than a disjointed and incoherent monologue.  *Id.*

The remainder of Lucienne's statements were not hearsay because they were indisputably false and therefore could not possibly have been offered to prove the truth of the matter asserted.  *See United States v. Bowles*, 751 F.3d 35, 39–40 (1st Cir. 2014) (concluding that signature endorsements on the backs of checks were

not inadmissible hearsay because the large majority of endorsements purported to represent the signatures of deceased individuals and thus were indisputably false). Lucienne made numerous statements to Defendant that Rodriguez was being "a man," taking the blame, and remaining silent. But, of course, that was not true. Whether or not he was being a man, Rodriguez was certainly not remaining silent because he was already cooperating with the government. In fact, Rodriguez had testified on this point at trial, prior to the admission of these conversations. Additionally, Lucienne stated to Defendant that Rodriguez had recorded the conversation with Defendant when Defendant paid him $25,000 as part of the murder-for-hire scheme. This statement too was obviously false. Lucienne had made up the existence of a recording in order to get Defendant's reaction, and hopefully an incriminating admission. Likewise, Lucienne's statement to Defendant, "I don't work for the police," was patently false. She was voluntarily wearing a wire placed on her person by the FBI. All these statements were offered as evidence "solely for the fact that [they were] made and the effect [they] might have upon [their] hearer." *See Cruz*, 805 F.2d at 1478.

Finally, we recognize that one of Lucienne's statements arguably may have constituted hearsay though, again, we note that Defendant did not object to it at trial. She told Defendant, "[My husband] said you offered him 100,000 dollars, and that if you give me the 100,000 dollars, he'll keep silent and it will all end here

15

. . . . On April 20 you gave him 25,000 dollars and he recorded it . . . ." It was the government's theory that part of this statement was true: that is, Defendant had offered Rodriguez $100,000 and he had given him a $25,000 down-payment. But even if the government hoped that the jury would ultimately conclude that Defendant had offered a $100,000 bounty on Caldera's head, with a $25,000 down-payment, it did not need Lucienne's taped statement to Defendant to prove that point. Her husband and Defendant's coconspirator, Ricardo Rodriguez, had earlier testified that Defendant had offered and paid him money to have Caldera killed, and Rodriguez was subject to cross-examination by Defendant on that assertion. Clearly, Rodriguez's testimony did not constitute hearsay. Rather, Lucienne's taped statements on this point were offered merely to show the effect those statements had on Defendant and to provide context for his later response and agreement to pay Lucienne $100,000. *See id.*; *United States v. Price*, 792 F.2d 994, 997 (11th Cir. 1986) (recorded statements offered to "make understandable to the jury the statements made by [the defendant]" were not inadmissible hearsay). Still, if Defendant had any concerns that any of Lucienne's statements were improperly being offered for the truth of the matter asserted, he should have objected and gotten an appropriate limiting instruction. He failed to do so.

In short, where the admission of the substance of a communication between the defendant and another person is sought, the fact that the statements made by the

16

other person were out of court does not, as a blanket matter, preclude admission. Certainly, specific statements in the conversation may be vulnerable to a hearsay objection. But first the defendant has to identify these statements and object to their admission. That did not happen here, and our own review reveals no improper hearsay within the taped conversation that could have prejudiced Defendant.

Finally, because Lucienne's statements and testimony were not hearsay, there is no need for them to fit within an exception to the rule against hearsay. *See United States v. Mateos*, 623 F.3d 1350, 1364 (11th Cir. 2010) ("If the statement is not hearsay in the first place, there is no need for it to fit within an exception to the rule against hearsay."). Accordingly, Defendant's argument that Lucienne's taped statements were not admissible as statements of a coconspirator made in furtherance of the conspiracy, under Rule 801(d)(2)(E), is beside the point.

In short, we find no hearsay and we find no error—plain or otherwise—in the admission of the taped conversations between Lucienne Rodriguez and Defendant.

B.    Opinion Testimony

Defendant also contends that the district court improperly admitted into evidence Lucienne's opinion testimony as to the meaning of Defendant's recorded statements. Rule 701 of the Federal Rules of Evidence permits opinion testimony

17

by lay witnesses.  To qualify, a witness's opinion is limited to opinions that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  Lay opinion testimony must be based on "first-hand knowledge or observation" and "helpful in resolving issues."  *United States v. Jayyousi*, 657 F.3d 1085, 1102 (11th Cir. 2011).  Where a witness's testimony is based upon her "perceptions of the conversations[,] . . . the accuracy of those perceptions [is] a question for the jury."  *United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir. 1986).  Additionally, a witness may clarify conversations that are "abbreviated, composed with unfinished sentences and punctuated with ambiguous references to events that [were] clear only to the [defendant] and [the witness]."  *United States v. Awan*, 966 F.2d 1415, 1430 (11th Cir. 1992) (internal quotation marks omitted).

In their briefs, the parties point to six instances where the district court overruled Defendant's recurring objection that Lucienne was offering opinion testimony.  First, during their taped May 6, 2012, in-person meeting, in explaining how Rodriguez was caught, Lucienne started to tell Defendant that "it look[ed] like [Rodriguez] went to see somebody and he paid him the money and all that . . . ."  Defendant completed Lucienne's statement with, "[t]o do what has to be done."

Lucienne testified that she understood this to mean that Defendant was "already aware of what was going on."

Second, in attempting to distance himself from whatever Rodriguez might have done or been accused of doing, Defendant told Lucienne, "I talked to him about . . . how should I put it?  Following someone, but in the investigation, not for, for something, you understand what I'm saying?  Look, that's true, I tell him, 'Look . . . this person . . . .'"  Asked to explain, Lucienne testified that "[Defendant], what he was explaining to me was that [Rodriguez] was to follow that individual."

While testifying about that same conversation, Lucienne was asked what she thought was being discussed when Defendant had stated, "Hey, I'll tell you something.  That's impossible because first of all, the person that talked to him went and told him, 'Look I'm going to give you this for you to investigate, that's all[].'"  Lucienne testified that she understood this to mean that Defendant had asked Rodriguez only to investigate someone.  Defendant later told Lucienne ". . . paying someone else to do something bad to another person, but, uh, it was a mistake I made."  Lucienne testified that, to her, this meant that "it was something that he was paying for that it was a mistake that he made."

During their May 15, 2014, in-person conversation, after Lucienne confronted Defendant about having offered Rodriguez $100,000 to hire a hit man

19

and about having already paid Rodriguez $25,000 for the job, Defendant stated,

"Tell him I'm a man of my word and I'm going to come through.  But he has to

understand that nobody's going to talk about what he thinks you've told me and

what answer can I give you? [sic] You follow me?  Nobody's going to tell you."

Lucienne testified that she understood this statement to mean that nobody was

going to tell her the truth.  At the end of their conversation, Defendant stated to

Lucienne, "All right.  It's going to be 100-100."  Lucienne testified that she

understood this to mean that she would be paid $100,000, and Rodriguez would

keep silent.

The district court did not abuse its discretion by admitting the above

testimony that clarified Lucienne's understanding of the substance of her

conversation with Defendant.  First, Lucienne's testimony was rationally based on

her perception, first-hand knowledge, and observation.  *See Jayyousi*, 657 F.3d at

1102.  She was a participant in the conversations, and the statements by Defendant

at issue were made directly to her.  *See Awan*, 966 F.2d at 1430 (undercover

agent's opinion testimony was based on his personal perception because he "was

actually present and participating in the conversation and observing what was

happening at the time").

Second, her testimony was helpful to the jury in understanding the facts at

issue.  Lucienne was clarifying a back-and-forth dialogue that contained

20

abbreviated and unfinished sentences, with occasional unclear responses and ambiguous references to events.  *See id.*; *Jayyousi*, 657 F.3d at 1103 ("We have held that a lay witness may provide interpretations of code words when the meaning of these words [is] not perfectly clear without [the witness's] explanations.") (internal quotations omitted).  For example, she was asked what vague statements meant to her, such as "to do what has to be done," "in the investigation . . . for something," and being given "this" to investigate.

In short, we conclude that the district court did not abuse its discretion by permitting Lucienne to clarify the conversations between herself and Defendant in the above-described instances.

C.    Prosecutorial Misconduct Through The Cross-Examination of the Defendant

Defendant contends that the prosecutor engaged in misconduct when, several times during cross-examination, he asked Defendant whether other witnesses who had testified contrary to Defendant on particular matters were lying. Defendant objected to most, but not all, of these kinds of questions.  The district court overruled some of Defendant's objections, but sustained others. [4]

---

[4]  For example, the prosecutor asked Defendant the following questions during cross-examination:

Q. Now, we heard from Mr. Bolufé, the individual who you've known for a while, who introduced you to Felipe Caldera.  He told you don't invest with Felipe after a while, didn't he?

A. That's ironic when he's the one who told me to invest with him.

21

1.    Standard Governing "Were-They-Lying" Questions

A prosecutor's comments amount to misconduct when the comments are both improper and prejudicial to the defendant's substantial rights. *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006). The defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the comments, the outcome of the trial would have been different. *Id.* "When the record contains sufficient independent evidence of guilt, any error is harmless." *Id.*

Q. At the beginning.

A. And throughout.

Q. So, he was lying?

A. I can't speak for him.

Q. Well, you heard what he said on the stand.

A. I heard what he said.

Q. Was what he said true or not true?

A. You know, what he's saying. I really can't speak for him. But that's not what he told me, no.

Q. Okay. So, what you're saying is what he testified to on the stand was a lie.

A. Correct.

While Defendant did not object to the above exchange, he objected when the prosecutor later asked, "So, Mark Hemmerle was lying?" The district court overruled Defendant's objection.

Later during cross-examination, the prosecutor asked Defendant, "So everybody you do business with, at the time you do business, they're not liars, but once they testify in court, they . . . ." Defendant objected to this question as being argumentative, but the district court overruled the objection, and Defendant testified, "No, I didn't say that."

As to the propriety of questions by a prosecutor that prod a defendant to accuse another witness of lying, we have held that such questions are not proper. *United States v. Schmitz*, 634 F.3d 1247, 1268 (11th Cir. 2011).  We forbid such questions for several reasons.  First, there are technical sorts of rationales for disallowing them.  As we noted in *Schmitz*, the Federal Rules of Evidence do not permit such questions.  *Id.*  While Rule 608(a) permits a witness to testify as to another witness's general character for truthfulness or untruthfulness, the rule does not allow the witness to opine about another witness's truthfulness on a particular occasion, such as while on the witness stand.  *Id.*  Second, the duty to make credibility determinations about a trial witness falls squarely in the province of the jury, and it is not appropriate for another witness, even the defendant, to tread on the jury's turf.  *Id.* at 1269.  Third, asking a defendant to brand as a liar another witness whose testimony is at odds with the defendant's ignores the fact that two witnesses can testify inconsistently without either of them necessarily having purposely lied.  Innocent, alternative explanations for discrepancies in testimony can include "lapses in memory, differences in perception, or a genuine misunderstanding."  *Id.*

Beyond just the technical reasons for disfavoring these types of questions is the fact that questioning along these lines can distract the jury from its central task of trying to figure out which version of events is accurate, not what label to place

23

on the witness whose narrative appears less accurate.  *Id.*  Further, the "were-they-lying" line of questions can rapidly become argumentative to the extent that the questions force the defendant to hurl accusations at contrary witnesses.  *Id.*

Of course, the fact that a prosecutor should not ask a testifying defendant whether another witness was lying does not mean that the prosecutor will be prohibited from pinning down a defendant's testimony by focusing the latter on conflicts between his account of a certain event and another witness's testimony on that point.  Indeed, in *Schmitz*, we cited with approval the Third Circuit's observation that "it is often necessary on cross-examination to focus a witness on the differences and similarities between his testimony and that of another witness.  This is permissible provided he is not asked to testify as to the veracity of the other witness."  *Schmitz*, 634 F.3d at 1269–70 (quoting *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006)).

In short, this is an area in which form could perhaps be said to trump substance, and, given this reality, a prudent prosecutor must work to frame his questions properly.  No doubt, there are a number of ways in which a skilled cross-examiner can properly highlight conflicts between the defendant's testimony and that of other witnesses.  What he cannot do, though, is ask the testifying defendant whether a particular witness was lying.  And here, several times, the prosecutor did frame his question in the prohibited manner.

So, Defendant has succeeded in meeting the first prong of the test for prosecutorial misconduct:  showing that some of the prosecutor's comments (or here, his questions) were improper.  But there is a second prong that Defendant must also satisfy, which is demonstrating that the improper questions were prejudicial to the defendant's substantial rights.  As noted *supra*, a defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the questions, the outcome of the trial would have been different.  If the record reveals sufficient independent evidence of the defendant's guilt, the prosecutor's asking of the *verboten* question at issue will be deemed harmless.  We therefore proceed to a review of the evidence here to determine whether any error resulting from the prosecutor's questions can be fairly said to be harmless.  Our review confirms that, given the substantial evidence pointing to Defendant's guilt, one can reasonably conclude that Defendant would have been convicted, regardless of the prosecutor's "were-they-lying" questions.

2.    Substantial Evidence of Defendant's Guilt

Ricardo Rodriguez, Defendant's coconspirator and the intermediary who was to have hired the hit man, testified that:  (1) Defendant offered him $100,000 to find someone to kill Caldera; (2) Defendant provided him with Caldera's contact information; and (3) once Rodriguez found a hit man, Defendant gave him $25,000 as a down payment for the hit man.  Certainly there was irrefutable evidence that

25

Rodriguez did all the above acts, and thus all that was left to implicate Defendant was to confirm Rodriguez's testimony that Defendant was behind the plot. That corroboration occurred through Defendant's own statements and acts, when he was being covertly taped by Lucienne Rodriguez. For example, even though Lucienne did not tell Defendant why Rodriguez was arrested, Defendant already seemed to know the reason and the identity of the intended victim. He stated that the victim was okay, that the victim owed "everyone" money, and that many people were "after the victim." He acknowledged that he had asked Rodriguez to follow someone, but initially denied that he had wanted Rodriguez to do any more than that. When Lucienne told Defendant that she had a copy of a tape-recorded conversation between Defendant and Rodriguez, during which conversation Defendant had given Rodriguez $25,000 for the hit, Defendant's response was not to say that there could be no such taped conversation because such an exchange never occurred. Instead, he immediately agreed to pay Lucienne $100,000 in exchange for Rodriguez's silence and the purported recording of the incriminating conversation. Indeed, Defendant subsequently gave Lucienne $20,000 for that very recording.

In addition, there was ample evidence of Defendant's motive to kill Caldera. Caldera had effectively stolen from Defendant when he had grossly overstated the value of airplane parts that he gave Defendant as repayment for a large loan.

26

Further, when Defendant had loaned Caldera an additional $350,000 to take measures to repay the almost $4 million that he owed Defendant, Caldera had instead spent the money elsewhere. Of course, Defendant's strongest motive to kill Caldera was the fact that Defendant's company was the owner and beneficiary of a $5 million life insurance policy on Caldera's life.

In response to this very damning evidence, Defendant testified, but offered only confusing and inconsistent explanations. In trying to explain his conversation with Lucienne, Defendant claimed that he believed he and Lucienne were discussing stolen equipment he had purchased from Rodriguez, not a murder-for-hire scheme. Yet this explanation was contradicted by his earlier testimony that he had never known nor had reason to believe that the equipment he purchased from Rodriguez was stolen, not to mention the fact that, at some point in his ongoing dialogue with Lucienne, Defendant clearly had to be on notice of the reasons for Rodriguez's arrest.

As to the murder-for-hire scheme, he testified that, in his conversations with Lucienne, he had pretended to be involved only in order to learn more about what was going on and that he had agreed to pay Lucienne $100,000 only in order to buy time to figure out what really happened. Yet, he subsequently acknowledged that he was going to give Lucienne $100,000 to help her pay for Rodriguez's attorney. And whatever reasons he might have asserted for a promise to pay

27

$100,000 in the future, there is the fact, confirmed by the tape-recorded conversation between him and Lucienne, that he actually did pay her $25,000 for what he and she agreed would be Rodriguez's silence and a copy of the purported tape recording of the conversation between Rodriguez and Defendant. Finally, Defendant denied that he even cared that Caldera owed him almost $4 million. Defendant's lack of concern, he said, was because that money represented only interest, not principal.

This unimpressive account of events by Defendant did, by itself, potentially constitute substantive evidence of Defendant's guilt. This is so because a jury is free to disbelieve a defendant's testimony and consider it as substantive evidence of the latter's guilt. *See United States v. McDowell*, 250 F.3d 1354, 1367 (11th Cir. 2001). Given the inconsistencies and implausibility of much of Defendant's testimony, one can reasonably infer that the jury so interpreted his testimony.

In short, there was abundant evidence presented at trial to support a conclusion that, beyond any reasonable doubt, Defendant was guilty. Further, while the prosecutor should not have asked Defendant whether the latter was accusing various witnesses of lying, in truth, the existence of substantial inconsistencies between the testimony of those witnesses and of Defendant was an appropriate matter for the jury to consider in evaluating the credibility of each witness and, ultimately, in deciding exactly what had happened. Finally, the

28

district court made clear in its instructions that it was up to the jury to "decide whether [it] believe[d] what each witness had to say and how important that testimony was. In making that decision [it] may believe or disbelieve any witness in whole or in part."

Accordingly, any error created by the prosecutor asking the "were-they-lying" questions was harmless and not a persuasive ground for reversal. *See United States v. Thomas*, 453 F.3d 838, 846 (7th Cir. 2006) (concluding that questions did not influence the jury's verdict because of the weight of the evidence and the standard jury instruction advising the jury of its role to decide the credibility of all witnesses and to judge the testimony of the defendant in the same way as any other witness); *United States v. Williams*, 343 F.3d 423, 437–38 (5th Cir. 2003) (concluding that questioning did not affect the defendant's substantial rights because the prejudicial effect was small, the jury was properly instructed on its role as a fact-finder, and the evidence of guilt was overwhelming); *United States v. Sullivan*, 85 F.3d 743, 750 (1st Cir. 1996) (finding that questions were harmless error because evidence of guilt was very strong and the error was on a minor point); *United States v. Boyd*, 54 F.3d 868, 872 (D.C. Cir. 1995) (finding no prejudice from the prosecutor's questions, in part, because of an instruction that advised the jury that the statements and arguments of counsel are not evidence and because of the minimal importance of the challenged question).

Yet, while this type of error will often be harmless,[5] we do not mean by this observation to offer encouragement to prosecutors to continue the practice at issue here. Asking a question in this prohibited form creates a needless appellate issue, and prosecutors cannot be assured that the error will always be harmless. Given how easy it would be to properly frame a question that focuses on inconsistencies between the testifying defendant and another witness, a prosecutor commits an unforced error when he phrases the question incorrectly. And because a skilled cross-examiner could cover the same ground without slipping into error, we suspect that a prosecutor who so missteps may well be unaware of the prohibition against this line of questioning. For that reason, we urge United States Attorney's offices in our circuit to do a better job of training their attorneys on this point. Here, however, the error was clearly harmless and not a ground for reversal.

---

[5] Defendant has cited no case in which a conviction has been reversed due to a "were-they-lying" question being asked. Without being able to definitively state that no federal court has ever reversed a conviction on this ground, we do note that our own non-exhaustive survey of this area vindicates Defendant's inability to find such cases.

For sure, our sister circuits agree that these types of questions are inappropriate. *See Schmitz*, 634 F.3d at 1268 (compiling case law from other circuits). Yet despite their disapproval of such questions, circuit courts have consistently found this error harmless. *Id.* Although not made explicit in the caselaw, this result may largely be due to the fact that the flaw in the question lies mainly in its form, not its substance, as the existence of an inconsistency between the testimony of two witnesses is a matter that juries are affirmatively instructed to consider in assessing credibility.

D.    Alleged Prosecutorial Misconduct in Closing Argument

In a related challenge, Defendant also contends that some of the prosecutor's comments during closing argument were improper attacks on his credibility. We disagree. The prosecutor argued:

> [Co-counsel] and I went home last night and tried to make a chart of every single lie and inconsistency in the defendant's testimony over two days. You know what? We would be here for another two weeks. It was nonstop. At one point his attorney had to tell him to answer the question. He could not give a straight answer on anything.
>
> And recall, every time we took a break he talked to his attorneys, the story changed . . . .
>
> Yes, you saw the frustration on my face. I could not get a straight answer to one question.
>
> Not only that, the story changed so many times I couldn't remember the whole story, just like the argument that was just made. It is full of contradictions.

The prosecutor also contrasted Defendant with Rodriguez, after pointing out that Rodriguez was totally honest throughout the course of his ten meetings with law enforcement:

> Now, we saw the defendant testify for two days. I don't think I asked him 1,000 questions, but, frankly, after all that I don't remember. I don't think he said one thing that was true in front of all of you. Not one thing. No matter what they asked Ricardo Rodriguez, his story stayed the exact same. No matter how hard they pressed, his story never changed. Not once. We cannot say the same thing for the defendant.

31

Defendant did not object to the prosecutor's statements during closing argument, so we review for plain error. *See House*, 684 F.3d at 1197.

A prosecutor is expected to refrain from offering his personal views on a defendant's guilt or on the evidence. *Parker v. Allen*, 565 F.3d 1258, 1273 (11th Cir. 2009). Yet, a prosecutor is free to suggest during oral argument what the jury should conclude from the evidence before it. *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984). "[A]n attorney's statements that indicate his opinion or knowledge of the case as theretofore presented before the court and jury are permissible if the attorney makes it clear that the conclusions he is urging are conclusions to be drawn from the evidence." *Id.* We evaluate the prosecutor's comments in the context of the full trial and any curative instructions "to determine whether the comments so unfairly affected the trial." *Parker*, 565 F.3d at 1273.

We conclude there was no error here. When viewed in context, the prosecutor was urging the jury to draw certain conclusions from the evidence. He was not interjecting his personal views of the evidence or Defendant's guilt. In both statements recited above, the prosecutor offered a conclusion that he suggested the jury could properly draw: that Defendant's denials of involvement in the conspiracy were not credible, while Rodriguez's testimony was entirely credible. The prosecutor made the first challenged comment after providing two specific examples of inconsistencies in Defendant's testimony. After making the

32

comment about attempting to create a chart of Defendant's lies and inconsistencies, the prosecutor then went on to describe other specific inconsistencies between Defendant's actions and testimony. Likewise, in the second comment, the prosecutor focused on the fact that Rodriguez's story and testimony had remained consistent, while Defendant's story had repeatedly changed.

Defendant relies on *Schmitz* in arguing that the prosecutor's comments during closing arguments were improper. During closing arguments in *Schmitz*, the prosecutor "hammer[ed] home the idea of a 'liar list,' which was a metaphor improperly developed during Schmitz's cross-examination." *Schmitz*, 634 F.3d at 1270. While cross-examining Schmitz, the prosecutor had asked "were-they-lying" questions by calling out the names of twelve witnesses who had testified, and then asking Schmitz if each one should be added to the "list" of people that Schmitz claimed were lying. *Id.* at 1267. Then, in closing arguments, the prosecutor made at least two references to the "liar list" that he had created on cross-examination. *Id.* We concluded that the comments about the "liar list" during closing arguments were improper precisely because they were a "clear

continuation of the improper questions posed previously during Schmitz's cross-examination."[6] *Id.* at 1270.

Defendant's reliance on *Schmitz* to argue similar misconduct here is misplaced because the facts are distinguishable. Here, the prosecutor's comments were not a "clear continuation" of improper cross-examination questions. During cross-examination, the prosecutor asked Defendant multiple times whether other witnesses were lying. But in closing arguments, the prosecutor's challenged comments were not focused on whether Defendant had accused *other* witnesses of lying. Instead, the comments focused on Defendant's own credibility and the inconsistencies in his own testimony, as contrasted with the consistency of a government witness's testimony.

In short, Defendant argues that, although he never objected to the prosecutor's comments in closing argument, the district court should have taken it on itself to interrupt opposing counsel's argument and strike the comments at issue. According to Defendant, the district court's failure to so act was plain error. We disagree and find no error here.

For the foregoing reasons, Defendant's convictions are **AFFIRMED.**

---

[6] We, however, declined to reverse Schmitz's conviction because of the improper cross-examination or the emphasis on that questioning during closing argument: Schmitz had not objected to either at trial and, applying a plain error standard, we found no reversible error. *Schmitz*, 634 F.3d at 1271.

34