*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ROBERT LANCE PROPP,

        Defendant-Appellant.

FOR PUBLICATION
February 24, 2022
9:10 a.m.

No. 343255
Saginaw Circuit Court
LC No. 16-042719-FC

## ON REMAND

Before: MURRAY, P.J., and K. F. KELLY and BORRELLO, JJ.

PER CURIAM.

In *People v Propp*, 330 Mich App 151; 946 NW2d 786 (2019) (*Propp I*), we affirmed defendant's conviction and sentence of life imprisonment without the possibility of parole for first-degree premeditated murder.[1] The Supreme Court granted defendant leave to appeal, *People v Propp*, 506 Mich 939 (2020), and issued a decision reversing in part, and vacating in part, this Court's opinion, and remanding for further consideration. *People v Propp*, ___ Mich ___, ___; ___ NW2d ___ (2018) (Supreme Court Docket No. 160551) (*Propp II*). Specifically, the Court sent back the following issues for us to resolve:

> We conclude that the Court of Appeals erred by applying the wrong standard to review defendant's request for expert assistance and by failing to consider other rules of evidence when determining the admissibility of prior acts. Accordingly, we vacate Part II of the judgment of the Court of Appeals addressing due process, reverse Part IV of the judgment of the Court of Appeals addressing the application of MCL 768.27b, and remand to that same court for further proceedings not

---

[1] The panel was partially split on the reasoning. Compare *Propp*, 330 Mich App at 159-183 (majority opinion) with 184-188 (MURRAY, C.J., *concurring*).

inconsistent with this opinion. We do not retain jurisdiction. [*Propp II*, ___ Mich at __; slip op at 10.]

We again affirm defendant's conviction and sentence.

In the interest of judicial efficiency, we assume the reader is familiar with the facts as laid out in *Propp I*, 330 Mich App at 156-159, and the reasoning and conclusions of the Supreme Court in *Propp II*. Our decision below is made in light of both prior decisions.

As a threshold consideration, because the Supreme Court held that it was reversing the analysis in Part IV of this Court's opinion "addressing the application of MCL 768.27b," *Propp II*, ___ Mich at ___; slip op at 10, we are not required to reconsider defendant's argument—which was also analyzed in Part IV of *Propp I*—"that testimony from his ex-wife that defendant sexually assaulted her during the course of their marriage was inadmissible under MRE 403," see *Propp I*, 330 Mich App at 181-183. Rather, viewing the Supreme Court's remand instructions in context, the two issues on remand are (1) whether defendant is entitled to a new trial as a result of the trial court's denial of his motion to appoint an expert witness at state expense, and (2) whether the trial court committed error requiring reversal by admitting certain hearsay statements concerning "other acts" of stalking or domestic violence committed by defendant. We now turn to those issues.

## I. FAILURE TO APPOINT AN EXPERT AT STATE EXPENSE

For the reasons stated in then-CHIEF JUDGE MURRAY'S concurrence in *Propp I*, we hold that the trial court did not commit error entitling defendant to a new trial by denying defendant's motion to appoint an expert in erotic asphyxiation at state expense.[2]

In *Kennedy*, 502 Mich at 213, the Court addressed two fundamental legal questions: (1) "what law applies to [a] defendant's claim that the trial court violated his due process rights when it denied his request for the appointment of a[n] . . . expert," and (2) "what showing [a] defendant must make to be entitled to the appointment of the expert." With regard to the first of those issues, the Supreme Court decided that *Ake* "sets forth the due process analysis that a court must use when an indigent criminal defendant claims he or she has not been provided the basic tools of an adequate defense and therefore did not have an adequate opportunity to present his or her claims

---

[2] We first ensure that the issue has been properly preserved. In his motion to appoint an expert witness at state expense, defendant did not expressly cite any supporting constitutional provision, but he did argue that the appointment of an expert was necessary for him to "hav[e] a fair opportunity to present his defense[.]" Consequently, under a forgiving approach to issue-preservation, the instant due-process issue is subject to review "under the standard for preserved constitutional error." See *People v Kennedy*, 505 Mich 1031 (2020) (reversing this Court's holding that a due-process challenge like the one at bar was unpreserved—and thus subject to plain-error review—and remanding for this Court's "reconsideration under the standard for preserved constitutional error"). Under that standard, if an error occurred, the prosecution has the burden of proving, beyond a reasonable doubt, that the error was harmless. See *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999).

fairly within the adversarial system." *Kennedy*, 502 Mich at 218 (quotation marks, citations, and brackets omitted). However, turning to the second inquiry, the Supreme Court recognized that *Ake* is not particularly helpful:

> Although *Ake* governs requests by an indigent criminal defendant for the appointment of an expert at government expense, the [United States] Supreme Court has not explained how this showing must be made. This question is critical. Until an expert is consulted, a defendant might often be unaware of how, *precisely*, the expert would aid the defense. If, in such cases, the defendant were required to prove in detail with a high degree of certainty that an expert would benefit the defense, the defendant would essentially be tasked with the impossible: to get an expert, the defendant would need to already know what the expert would say. At the same time, the defendant's bare assertion that an expert would be beneficial cannot, without more, entitle him or her to an expert; otherwise, every defendant would receive funds for experts upon request. [*Kennedy*, 502 Mich at 225-226 (footnotes and citations omitted).]

In answering this question, the Court adopted the "reasonable probability" standard from *Moore*, under which:

> [A] defendant must demonstrate something more than a mere possibility of assistance from a requested expert; due process does not require the government automatically to provide indigent defendants with expert assistance upon demand. Rather . . . a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial. Thus, if a defendant wants an expert to assist his attorney in confronting the prosecution's proof—by preparing counsel to cross-examine the prosecution's experts or by providing rebuttal testimony—he must inform the court of the nature of the prosecution's case and how the requested expert would be useful. At the very least, he must inform the trial court about the nature of the crime and the evidence linking him to the crime. By the same token, if the defendant desires the appointment of an expert so that he can present an affirmative defense, such as insanity, he must demonstrate a substantial basis for the defense, as the defendant did in *Ake*. In each instance, the defendant's showing must also include a specific description of the expert or experts desired; without this basic information, the court would be unable to grant the defendant's motion, because the court would not know what type of expert was needed. In addition, the defendant should inform the court why the particular expert is necessary. We recognize that defense counsel may be unfamiliar with the specific scientific theories implicated in a case and therefore cannot be expected to provide the court with a detailed analysis of the assistance an appointed expert might provide. We do believe, however, that defense counsel is obligated to inform himself about the specific scientific area in question and to provide the court with as much information as possible concerning the usefulness of the requested expert to the defense's case. [*Kennedy*, 502 Mich at 226-228 (alteration and ellipsis in original), quoting *Moore*, 809 F2d at 712.]

"In particular," the Supreme Court emphasized, "a defendant must show the trial court that there exists a reasonable probability *both* that an expert would be of assistance to the defense *and that denial of expert assistance would result in a fundamentally unfair trial*." *Kennedy*, 502 Mich at 228 (emphasis added), quoting *Moore*, 809 F2d at 712.

In *Propp I*, 330 Mich App at 184-185, the concurring judge analyzed the issue as follows:

[W]ith respect to the appointment of a defense expert witness at the state's expense, I would conclude that defendant satisfied the first part of the "reasonable probability" standard from *Moore* . . . adopted by the Supreme Court in [*Kennedy*]. . . .

Several courts have recognized that the process of evaluating the "reasonable probability" standard is a "dynamic one" that is, naturally, very case specific. *Moore v State*, 390 Md 343, 369; 889 A2d 325 (2005). This case is neither heavy on the facts nor on the science or legal theories presented. In both defendant's motion and supporting brief, as well as at the motion hearing, defense counsel informed the trial court about "the nature of the crime and the evidence linking [defendant] to the crime," *Kennedy*, 502 Mich at 227, quoting *Moore*, 809 F2d at 712 (quotation marks omitted), by indicating that defendant was being prosecuted for murder and that his defense was that he accidentally killed the victim through erotic asphyxiation. Defense counsel also . . . inform[ed] the trial court that the medical examiner's testimony would be that the victim died from strangulation, that defendant and the victim had previously been a couple, that erotic asphyxiation is a somewhat unknown defense in Michigan, that the proposed expert would be able to testify as to the practice of erotic asphyxiation, and that individuals can die through the practice.[3] Although this information is not nearly as detailed as that provided by the defendant in *Ake* . . . , the *Ake* Court specifically noted that it was not expressing an "opinion as to whether any of these factors . . . , alone or in combination, is necessary to make this finding." Because a reading of *Ake*, *Moore*, and *Kennedy* does not lead to the conclusion that defendant's burden of production is an overly burdensome one, I would hold that defendant satisfied the first portion of the reasonable-probability standard adopted in *Kennedy*.

However, as the majority concluded, in the end it is not reasonably probable that the denial of this expert assistance resulted in a fundamentally unfair trial. *Kennedy*, 502 Mich at 227. As ably recounted by the majority, in front of the jury the prosecution's expert recognized the practice of erotic asphyxiation and that the victim's death could have resulted from that practice. This testimony, in

---

[3] Defendant's trial counsel also informed the trial court that the defense had located a specific psychologist that it wished to retain as its expert in this area. See *Moore*, 809 F2d at 712 ("[T]he defendant's showing must also include a specific description of the expert or experts desired; without this basic information, the court would be unable to grant the defendant's motion, because the court would not know what type of expert was needed.").

conjunction with defendant's testimony about the circumstances surrounding the victim's death, presented the jury with a full and complete picture regarding the circumstances surrounding the victim's death, or at least defendant's version as to how it occurred. See *Stephens v Kemp*, 846 F2d 642, 646-647 (CA 11, 1988). As a result, no error requiring reversal occurred on this issue. [*Propp I*, 330 Mich App at 184-185 (MURRAY, C.J., *concurring*); some alteration and ellipses in original.]

We agree and adopt that analysis in full. In addition, we note that, although erotic asphyxiation may be a practice that might have been unfamiliar—or entirely unknown—to certain jurors, the essence of the defense was not so technical or complex that testimony from an expert would have been particularly helpful to the defense or the jury. See *Propp II*, ___ Mich at ___; slip op at 5-6 (observing that the defense at issue here is not an affirmative defense at all, but rather a variety of "accident" argument that simply seeks to undermine the intent element for murder). As defendant's trial counsel admitted at the hearing on the motion to appoint an expert, the proposed expert's testimony was not intended to tell "the jury . . . what happened," but rather to inform "the jury that this is this young man's defense, and this is what he says happened." But at trial, that very information was ably conveyed to the jury by defendant and his trial counsel *without* an independent defense expert. And, no additional expert testimony was necessary to explain such a simple concept to the jury—i.e., that defendant was claiming that he did not intend to kill the victim and that he must have done so accidentally while restricting her airflow (at her request) during a consensual sexual encounter. For these reasons, we hold that the trial court did not commit any error entitling defendant to a new trial by denying his motion to appoint a defense expert on the subject of erotic asphyxiation.

## II. HEARSAY

We again first look to whether the issue has been preserved. At the outset of defendant's trial, he was granted a standing objection with regard to any hearsay statements introduced as a result of the trial court's pretrial ruling regarding the admissibility of such statements under MCL 768.27b(1). Thus, this issue is preserved. See *People v Hamilton*, 501 Mich 1075 (2018).

As observed in *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013):

A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. Preliminary questions of law, including whether a rule of evidence precludes the admission of evidence, are reviewed de novo. Likewise, interpretation of a court rule is a question of law that we review de novo. [Footnotes and citations omitted.]

Under the harmless-error rule set forth by MCL 769.26, it is presumed that preserved, nonconstitutional error—such as evidentiary error—is harmless, and to overcome that presumption the appellant bears the burden of demonstrating, on the strength of the entire record, "that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 493, 495-496, 502; 596 NW2d 607 (1999).

"In general, hearsay—an out-of-court statement offered to prove the truth of the matter asserted—may not be admitted into evidence. MRE 801; MRE 802." *People v Green*, 313 Mich

App 526, 531; 884 NW2d 838 (2015). As noted in *Propp I*, 330 Mich App at 188 & n 4 (MURRAY, C.J., concurring), at oral argument before this Court the prosecution conceded that at least *some* hearsay evidence was seemingly admitted at trial, though the prosecution continued to assert that the vast majority of the alleged hearsay statements identified by defendant had been properly admitted for a variety of reasons, or did not entitle defendant to appellate relief. Specifically, the prosecution argued that most of the alleged hearsay statements were nonassertive (i.e., were not "hearsay" in the first instance), were properly admitted for nonhearsay purposes (i.e., for reasons other than proving the truth of the matter asserted), or did not warrant relief for defendant on appeal because they had been introduced by defense counsel—not the prosecution—at trial. The prosecution also argued that, to the extent that defendant sought to "challenge[] alleged hearsay . . . *in general*," he had abandoned any claim of error with regard to statements he failed to identify "with particularity" in his brief on appeal. Finally, the prosecution argued that, with regard to any inadmissible hearsay that was introduced at trial, defendant had failed to carry his burden under the harmless-error test of demonstrating that it was more likely than not that the error was outcome-determinative.

In reply, defendant argued, among other things, that the alleged hearsay statements *had* been "clearly set forth" in his initial brief on appeal. For purposes of clarification, however, defendant provided the following list:

> Vivian Colvin testified that Ms. Thornton "told me that he had choked her in her sister's bathroom . . . He had her neck like that and had her against the wall, and she had told me that she was afraid she was going to pass out because she was starting to see spots or stars and he eventually let her go. … She told me that he told her then, see how easy it would be for me to shut you up."

> When asked if Ms. Thornton indicated to her that Mr. Propp had physically assaulted her on any other occasions, Vivian Colvin testified that "a lot of it was done, she stated, where Willow couldn't see, like, he would pull the back of her hair, like at the bottom of the back of your hair and say things to her where Willow couldn't see what they were doing. I did another time see bruises on her arm, and jokingly, because I already knew what was going on, I said what happened there Melissa?"

> Deanne Hollingshead testified that police told her that they had found Mr. Propp around the block from her house with a knife after she saw someone attempting to pry into her bathroom window and called the police.

> Stefanie Thornton testified that Mr. Propp "told [Ms. Thornton] that they needed to hang out, or else he was going to take Willow from her."

> Erika Betts testified that Ms. Thornton told her that she and Mr. Propp were not getting back together after having broken up, and that "if I don't cooperate with him, he threatens me that I won't see my daughter, Willow, again, he'll keep her from me, and, you know, I'm afraid of what he might do.

Stefanie Thornton testified that Ms. Thornton moved out "because [Mr. Propp] had a drug problem and money problems, and he had stolen from her."

Rikki-Jo Cunningham testified that Ms. Thornton moved out of the house she shared with Mr. Propp "[b]ecause I was told that he had a coke problem."

Stefanie Thornton testified that "sometimes [Ms. Thornton] would try to leave and [Mr. Propp] would take her keys and her phone and he wouldn't give them back, and on a couple of occasions, he threw them out in the road."

Stefanie Thornton testified "one time Melissa called me over because he had broken a bunch of dishes in the kitchen and Willow swallowed a piece of glass."

Stefanie Thornton testified that "right after Willow was born, he shook up a bunch of 2-liters of pop and sprayed them all over the house. And she had just had a C-section, so I came over and I cleaned it up."

Stefanie Thornton testified Ms. Thornton "called me and told me she was really upset, crying, because he threw [Ms. Thornton's infinity lights] off of their balcony."

Stefanie Thornton testified, "one day I was at work, and my mom called me and said that Rob had took Melissa's phone from her, and Melissa had to go to Delta that night for school, and she was scared that Melissa would be without a phone [] in a snowstorm."

Stefanie Thornton testified that Mr. Propp once admitted to Ms. Thornton that he left his young children unattended at night while he was apparently out stalking her.

Cameron Dietrich testified that he had multiple conversations with Ms. Thornton about Mr. Propp stalking her.

Rikki-Jo Cunningham testified that Mr. Propp, "would constantly be texting her and calling her nonstop," and that Ms. Thornton "said she saw his vehicle pass a couple of times," when they were at a bar together.

Stefanie Thornton testified that while she was with Ms. Thornton in Detroit, Mr. Propp "called her from the time we left until the time we got back," because, "he was upset because he thought she was dressed inappropriately."

Angela Thornton testified that Ms. Thornton told her that Mr. Propp had driven through the alley near White's Bar where Angela and Ms. Thornton were having a drink.

Deanne Hollingshead testified that Mr. Propp once "picked a fight with my uncle because he wouldn't tell him where I went. Ms. Hollingshead also testified that Mr. Propp once went to her grandmother's house looking for her, and her grandmother told him that she may be at her aunt's house in Chicago, so Mr. Propp

showed up at her aunt's house in Chicago looking for her, but she was not there either.

As an initial consideration, several of the above-listed statements are instances of hearsay within hearsay—that is, they are the victim's out-of-court assertions concerning other out-of-court assertions allegedly made by defendant. "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." MRE 805. However, as argued by the prosecution, any out-of-court statements made by defendant did not constitute hearsay because they qualify as admissions by a party opponent. See MRE 801(d)(2); *People v Herndon*, 246 Mich App 371, 408; 633 NW2d 376 (2001). Thus, as to any instances of "hearsay within hearsay," the proper focus is whether *the victim's* out-of-court statement constituted inadmissible hearsay.

As another initial consideration, this Court is not bound by the prosecution's confession of error or its interpretation of the court rules governing hearsay. See *People v Perry*, 317 Mich App 589, 601; 895 NW2d 216 (2016) ("[W]e are not beholden to the prosecution's concession and conclude that the plain language of the statute permits multiple convictions for uttering multiple notes during only one transaction."). Here, although *some* of the statements that defendant identified qualify as hearsay, several do not, and it was seemingly proper for the trial court to admit the remainder either for nonhearsay purposes or under the exception set forth by MRE 803(3) ("Then Existing Mental, Emotional, or Physical Condition.").[4]

To begin with, several of the alleged hearsay "statements" are either questions—e.g., "see how easy it would be for me to shut you up[?]"—or are seemingly *in-court* testimony about various events given by eyewitnesses with firsthand knowledge—e.g., Colvin's testimony about seeing bruises on the victim's arm in the past. For spoken words to qualify as an assertive "statement" under the hearsay rules, those words must contain an assertion of fact that is—when made— "[]capable of being true or false." *People v Jones*, 228 Mich App 191, 204; 579 NW2d 82, mod in part on other grounds 458 Mich 862 (1998); see also *People v Stewart*, 397 Mich 1, 9; 242 NW2d 760 (1976), reh gtd on other grounds 400 Mich 540 (1977) (observing that "nonassertive acts or conduct are not an exception to the hearsay rule—rather, they are not hearsay in the first place."); accord *United States v Rivera*, 780 F3d 1084, 1092 (CA 11, 2015) (holding that neither "non-assertive statements that are incapable of being true or false" nor "statements that are indisputably false" qualify as hearsay). Questions are not assertions of fact, and Michigan does not recognize the "implied assertion" theory that has been adopted in some other jurisdictions. See *Stewart*, 397 Mich at 9; *Jones*, 228 Mich App at 204.

---

[4] MRE 803 provides:

Then Existing Mental, Emotional, or Physical Condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Moreover, even if they otherwise qualified as hearsay, all of the victim's statements regarding defendant's pattern of stalking, threats, and domestic violence were admissible as evidence concerning the victim's state of mind—and her fear of defendant—under MRE 803(3). See *People v Ortiz*, 249 Mich App 297, 310; 642 NW2d 417 (2001) ("Evidence of the victim's state of mind, evidence of the victim's plans, which demonstrated motive (the ending of the marriage and the tension between the victim and defendant), and evidence of statements that defendant made to cause the victim fear were admissible under MRE 803(3)."). Accord *People v Fisher*, 449 Mich 441, 450-451; 537 NW2d 577 (1995). Such statements were also admissible for several valid nonhearsay purposes, including the effect that they might have had in motivating defendant to kill the victim. See *id*. at 450, 453 ("In the case at hand, marital discord, motive, and premeditation are all at issue. Thus, the statements of the victim-wife are admissible to show the effect they had on the defendant-husband. This testimony will not offend the hearsay rule because it does not constitute hearsay.").

Finally, to the extent that a few of the victim's cited statements might have qualified as inadmissible hearsay that could not have been admitted for such nonhearsay purposes—e.g., Cunningham's testimony that she was "told that [defendant] had a coke problem"—defendant has failed to rebut the presumption that any such error was harmless. See *Lukity*, 460 Mich at 493, 495-496. Aside from such statements, "the evidence otherwise properly admitted was more than adequate for the jury to convict defendant." *Propp I*, 330 Mich App at 188 (MURRAY, C.J., *concurring*). Moreover, hearsay evidence of defendant's drug use was merely cumulative. At trial, defendant openly admitted that he had a problem with substance abuse and that he used cocaine on the evening of the victim's death. Hence, on the strength of the entire record, this writer opines that defendant has failed to demonstrate that it is more likely than not that the trial court's purported evidentiary error was outcome determinative.

Affirmed.

/s/ Christopher M. Murray
/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello