[PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-11358

_____

D.C. Docket No. 1:14-cr-00039-WLS-TQL-1


UNITED STATES OF AMERICA,

                                             Plaintiff - Appellee,

versus

EDDIE LEE PERRY,
CHAD RAGIN,

                                             Defendants - Appellants.


_____

Appeals from the United States District Court
for the Middle District of Georgia

_____

(September 29, 2021)

Before GRANT and MARCUS, Circuit Judges, and AXON,[*] District Judge.

MARCUS, Circuit Judge:

In 2014, Eddie Lee Perry and Chad Ragin along with seven other co-defendants were indicted by a federal grand jury on numerous charges related to their involvement in a substantial multi-year, multi-state drug distribution organization operating primarily in southern Georgia. The core charge was that Perry, Ragin, and the others conspired to possess with intent to distribute in excess of five kilograms of cocaine and in excess of 280 grams of cocaine base. The charged conspiracy ran from January 2010 until the end of 2013. As part of an extended investigation, and with a series of court-ordered wiretaps in hand, the government intercepted thousands of cellular phone calls involving Perry, Ragin, and the other conspirators. Many of these conversations involved coded discussions about drugs. Some of the calls expressly referenced "coke jewel," "powder," and something "for the nose." During the trial, the government introduced 100 of the calls through the testimony of its case agent, DEA task force officer Kevin Lee. The government also presented testimony from sixteen other witnesses and introduced Rule 404(b) evidence of other crimes, wrongs, and acts

---

[*] Honorable Annemarie Axon, United States District Judge for the Northern District of Alabama, sitting by designation.

against both Perry and Ragin.  After seven days of trial, the jury convicted Perry and Ragin on all counts.

In this consolidated appeal, Perry presents multiple challenges to his convictions, while Ragin attacks his sentence on several grounds.  Perry focuses primarily on agent Lee's testimony, arguing that the district court erroneously admitted it because Lee was not properly qualified as an expert, and that, in any event, the opinion testimony improperly blurred the line between expert and lay witness testimony and drew impermissible inferences for the jury.  But after a thorough review of an extensive trial record, we are satisfied that Lee was properly qualified as an expert in interpreting code words for drugs, and that Perry has failed to establish that he was substantially prejudiced by any offending comments Lee offered.  Similarly, we conclude that Ragin's challenges to his sentence are without merit.  We affirm.

I.

In early 2013, Drug Enforcement Administration and local law enforcement agencies in southwest Georgia and Miami, Florida jointly began an extensive investigation involving a large cocaine distribution scheme. As part of this inquiry, between April and June 2013, the agents obtained three 30-day court-authorized interceptions of calls on a cell phone used by Perry. During this period, the agents intercepted thousands of calls, including many discussing drug production and sales. Information drawn from the Perry wiretaps led to court-authorized spinoff wiretaps, including one in December 2013, which focused on Roger Ross, who was Perry's source of cocaine.

Many of the calls ranged from discussions about cooking cocaine to setting up potential sales. Three calls from April 13, 2013 are illustrative. The day started with a call between Perry and Odell Cleveland (a named co-conspirator). Among other things, Perry told Cleveland that he had "that Lulu for your ass," using the code word "Lulu" for powder cocaine. Perry then called Joseph Davenport (also a named co-conspirator) and told him that they needed to meet. Shortly thereafter, Perry spoke to Ross, his Miami supplier, and said that the powder cocaine was "good" and "dropping dem draws quick." At trial, Kevin Lee -- who was the narcotics and vice commander of the Thomas County Sheriff's Office, a task force officer working with the DEA, and the chief investigator in this case -- testified that "dropping dem draws quick" meant it was "easy to convert [] from powder

4

cocaine into crack cocaine." Ross then asked Perry if he wanted "some more" and Perry said yes. Perry also told Ross that "Ole Bro Bro he fixing to come get at me . . . so Imma need." Agent Lee testified that "Ole Bro Bro" referred to Joseph Davenport (a named co-conspirator and co-defendant) and that Perry was telling Ross he would need more cocaine in the future. On the same call, Ross told Perry that he was going to "have nephew do that and . . . hit ya up . . . later on." Agent Lee offered that "nephew" referred to Ross's cousin[1] and courier, Chad Ragin, who would deliver more cocaine.

The intercepted telephone calls also led to the arrests of several co-conspirators and the seizure of drugs and money. Thus, for example, on May 4, 2013, the wiretap surveillance team intercepted a phone call between Perry and Davenport. The two co-conspirators discussed their progress getting "one" from an unnamed man, which they could sell and charge "14 to make [] a dollar a piece." Agent Lee testified that the men were discussing buying one ounce of powder cocaine from Vert Washington (another co-conspirator) and selling it for $1,400, in order to make $100 each. On May 16, agent Lee received a call from an informant, who led Lee to a convenience store parking lot where Davenport and Washington were sitting in a vehicle. When agent Lee arrived, after obtaining

---

[1] In a written statement following his arrest, Ragin refers to Ross as his cousin. However, at several points in the taped conversations and at trial, Ragin is referred to as Ross's nephew.

consent to search, he found in the vehicle in plain view a cardboard tube containing three or four bags of cocaine. The next day, the team intercepted another call from Davenport to Perry. During the call, Davenport explained that he and Washington had been stopped by the police and that the police had found, and seized, cocaine -- specifically "[a]bout three halves and . . . some powder" -- from the vehicle.

Later that month, the surveillance team intercepted telephone calls between Perry and Darnel Anderson.[2] In one call, on May 28, 2013, Anderson asked Perry to bring "two by here," which, agent Lee later explained, referred to two circles of crack cocaine. The next day, Anderson called Perry again and told him to "go ahead bring me another." The same day, the team received a tip that Perry would be making a drug delivery to an unknown buyer. Dewayne Pearson, an investigator with the Cairo, Georgia Police Department, set up surveillance near Perry's residence and followed him to a car wash, where Perry met with Anderson. Pearson saw the two men enter a building for roughly five minutes before walking back to Perry's truck. Perry reached for something inside his truck and then returned to the building with Anderson for a few more minutes. Perry left, and "just moments" later, police returned to the car wash with a warrant for Anderson's arrest. As Anderson fled the scene, a pursuing officer saw him throw a shoe box

---

[2] Darnel Anderson died prior to Perry and Ragin's trial.

onto the roof of a nearby residence.  When the box was recovered, the officer found over 95 grams of crack cocaine inside.

In December 2013, the team intercepted phone calls between Perry and Ross that discussed Perry's efforts to collect money he owed to Ross.  During one of them, on December 16, 2013, Perry explained that "it's slow motion around here" and that he wasn't where he "need[ed] to be," which agent Lee told the jury meant that Perry hadn't collected enough money to repay Ross.  Ross pushed back, offering that Perry was making Ross look "real, real, real shady right now," and that "this cat" was calling him "six or seven times, back to back, back to back, back to back."  Agent Lee explained that Ross was "looking bad to his source of supply" because Ross couldn't pay.  Perry responded that Ross should "just let him know everybody okay it's just slow."

The next day, the team intercepted a call between Ross and Ragin.  This time, Ragin asked Ross if he'd spoken to Perry and the two discussed Ragin's plan to travel to Cairo, Georgia.  Then, on December 21, Ross called Perry again, asking about the money Perry owed him.  Perry told Ross that he had "a dub," or $20,000, as Lee explained it.  Ross expressed disappointment with the amount, but said he had "to get whatever [he] can get . . . right now."  The next day, Ross called Perry to tell him that Ragin would be driving from Miami to Cairo in order to collect the money.  During this call, Perry told Ross that he was placing tape

around the cash and the sound of wrapping tape around the money could be heard on the phone call.

That day, December 22, law enforcement agents surveilled Perry's residence in Cairo, Georgia.  They spotted Ragin's vehicle.  On his way back to Florida, Ragin was pulled over for speeding while driving through southern Georgia.  Officers discovered in the car a package wrapped in duct tape containing $18,870 in cash, and another $840 in cash on Ragin's person.   Ragin followed the agents back to the station in his own car, but had the presence of mind to call Ross on the way, explaining that he (Ragin) had been stopped by the police and that he believed "they watching that boy['s] house,"  or that the police were watching Perry's residence.  Ross then called Perry in order to warn him to "keep [his] eyes open" and "look[] out" and described the cash seizure.

At the police station, Ragin told the agents that the cash was his, but that he earned the money by selling cars.  The government later initiated forfeiture proceedings against the money, prompting Ragin to produce an affidavit from Nader Aweidh, who swore that he purchased a vehicle from Ragin for $20,000.  However, the team intercepted a series of phone calls between Ross and Ragin discussing different explanations for the money.  For example, during one call Ross told Ragin that they could find "somebody that could come back and say that, hey look I loaned him this money to go ahead and try to get a car that he wanted."

8

Ragin then proposed to "say it's my money" because "I got the lawsuit." At trial, Aweidh testified, for the government, that his affidavit was not true and that he only signed it "as a favor" to Ragin.

On September 11, 2014, a federal grand jury sitting in the Middle District of Georgia charged Eddie Lee Perry, Ragin, Ross, Davenport, Washington, Cleveland, and three other co-conspirators -- Xavier Jordan, Brandon Perry,[3] and Michael Perry[4] -- with conspiracy to possess with intent to distribute cocaine and crack cocaine beginning on or about January 1, 2010, and continuing until on or about December 31, 2013, "the exact dates being unknown to the Grand Jury," in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), (iii), 846. Perry was also charged in thirteen substantive counts with the use of a communication facility in furtherance of a drug crime, in violation of 21 U.S.C. § 843(b). Ragin was charged in two additional counts with the use of a communication facility in furtherance of a drug crime, in violation of 21 U.S.C. § 843(b); one count of conspiring to falsify records in a federal investigation, in violation of 18 U.S.C. § 371 in connection with 18 U.S.C. § 1519; and two substantive counts of falsifying records, in violation of 18 U.S.C. § 1519.

---

[3] Brandon Perry is Eddie Lee Perry's son.

[4] Michael Perry is Eddie Lee Perry's brother.

Perry, Ragin, and Davenport were tried together in a case that lasted seven days.[5] The tapes from the government's wiretap made up the vast majority of the evidence presented and included 76 calls intercepted from Perry's cell phone and 24 additional cellular phone calls intercepted from Ross's phone. Notably, the defendants did not object to the introduction of almost all of these phone calls. Counsel for Perry raised one hearsay objection to one phone call Perry received from Dexter Young on April 18, 2013. He claimed that Young was not present in court and would not testify, therefore the entire conversation was inadmissible hearsay. The district court overruled the objection. Other than this one hearsay claim, no other objections were raised to the admissibility of the other 99 recorded conversations.[6]

The government's main witness was agent Lee, who testified at considerable length. Agent Lee was qualified as an expert "in coded drug language and methods of trafficking, as well as the manufacture of crack cocaine from powder cocaine." As we've described, the government introduced 100 tape recorded conversations into evidence along with transcripts during the course of Lee's testimony. When relevant, he was asked about and opined on the meaning of

---

[5] Ross and the others were tried separately.

[6] After the calls were admitted, Perry's counsel objected to the government's questioning of agent Lee concerning two calls between Perry and individuals not named in the indictment, arguing that the calls were not relevant. The district court overruled both objections.

certain drug "code" words used by Perry and the others.  Perry's counsel objected

to the scope of Lee's testimony only one time, when Lee testified about a call

between Perry and Ross on December 16, 2013.  Perry claimed that Lee's

testimony invaded "the purview of the jury" by interpreting common English.  The

district court overruled the objection.  Perry's counsel offered another objection to

Lee's testimony on the ground that he was speculating about the meaning of one

conversation, but did not argue that this testimony invaded the province of the jury.

The government also introduced Rule 404(b) crimes, wrongs, or acts

evidence for both Perry and Ragin, involving events that fell outside the timeframe

of the charged conspiracy.  For Perry, the government moved to introduce the

factual basis surrounding his earlier federal conviction for the distribution of crack

cocaine in southern Georgia.  Perry objected, arguing that the evidence was unduly

prejudicial and would "give[] an unfair advantage[]" to the government.  The

district court disagreed, finding that the probative value of the evidence was not

outweighed by the danger of undue prejudice.  But, to limit any prejudicial impact,

the court directed the parties to omit any reference to Perry having been convicted

or having entered a guilty plea.

While Perry disagreed with the district court's ruling, he agreed that the

following stipulation conformed to the district court's ruling about what limited

11

information could be included in the 404(b) proffer.  The stipulation provided to

the jury read this way:

> Members of the jury, the United States and the Defendant Perry
> stipulate and agree that Defendant Perry made the following sworn
> statement in a prior court proceeding: "From on or about January 1,
> 1996, to on or about April 3, 2004, Eddie Lee Perry, Jr. was involved
> in the distribution of multi-ounce quantities of crack cocaine. During
> this timeframe, the Defendant was supplied with cocaine by various
> sources which included Michael Tise. The defendant sold crack
> cocaine at various locations in the Cairo, Georgia area.
>
> On April 3, 2004, Terrence Williams under the control of law
> enforcement made a controlled buy of cocaine base and cocaine from
> the defendant, Eddie Lee Perry, Jr. The buy was preserved on audio
> tape. The cocaine base purchased from the defendant on this date
> tested positive for a total of 93.4 grams and the cocaine tested positive
> for a total of 134.4 grams.
>
> After the sale on April 3, 2004 was consummated the officers
> converged at 1137 11th Street, Cairo, Georgia and arrested Eddie Lee
> Perry, Jr. The officers recovered the buy money that Williams used to
> obtain the cocaine from Perry, Jr. The officer[s] executed a search at
> 212 Humble Street, the home of Eddie Lee Perry, Jr[.] and recovered
> numerous boxes of sandwich baggies, two cups containing cocaine
> residue and a scale.

As for Ragin, the government's Rule 404(b) evidence related to his arrest in

this case, which occurred on September 23, 2014, at his home in Florida.  During

the arrest, law enforcement agents discovered 890 grams of cocaine, 947 grams of

heroin, and two handguns.  They also found a bag containing drug paraphernalia,

including a money counter and scales, and over $16,000.  After being arrested,

Ragin made an inculpatory statement that was received in evidence against him.

Ragin admitted that he held the drugs for co-defendant Ross:

> The cocaine and heroin you found at my house belongs to my cousin,
> Roger Ross.  Ross paid me to keep it for him.  I placed the cocaine
> and heroin where you found it.  He gave me a whole key (kilogram)
> of cocaine.  He gave me more than the amount of heroin.  He comes
> over and gets ounces of heroin at a time.  I've been keeping cocaine
> and heroin at my house for Roger Ross for about two or three months.
> Roger has given me 3 kilos of heroin and one [kilo] of cocaine to keep
> for him.

The jury found Perry, Ragin, and Davenport guilty on all counts.  It returned
a special verdict, finding that Perry conspired with the intent to distribute cocaine
weighing more than 5 kilograms and cocaine base weighing more than 280 grams,
and that Ragin conspired with the intent to distribute cocaine weighing less than
500 grams.  Perry was sentenced to 240 months in prison on the conspiracy count,
and 96 months on the remaining counts, to run concurrently for a total sentence of
240 months.  The court also imposed a mandatory assessment of $1,400 and a ten-
year period of supervised release.

At Ragin's sentencing, the district court considered the drugs and guns
found during Ragin's arrest as "relevant conduct" under the Sentencing Guidelines,
yielding a total offense level of 34 and a sentencing range of 168 to 210 months.[7]
The court sentenced Ragin to 180 months' imprisonment on the conspiracy count;

---

[7] The probation officer explained at the hearing that without this enhancement, Ragin would
have a total offense level of 28 and a sentencing range of 87 to 108 months' imprisonment.

96 months in prison on the two communication counts; and 60 months on the counts related to the falsification of records. The sentences on each of the counts were to run concurrently, yielding a total prison term of 180 months. Additionally, the court imposed a mandatory assessment of $600 and a six-year period of supervised release.

This consolidated appeal followed.

## II.

## A.

Perry raises several claims concerning the admissibility of the expert testimony of agent Kevin Lee. Perry argues that the district court erroneously qualified Lee as an expert in coded drug language, and that Lee improperly offered opinion testimony beyond his expert knowledge. In the process, he wrongfully invaded the province of the jury. We are unpersuaded.

We review a district court's evidentiary decisions concerning the admissibility of expert testimony for abuse of discretion, which means we will not reverse unless the ruling is "manifestly erroneous." United States v. Barton, 909 F.3d 1323, 1330 (11th Cir. 2018) (quoting United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc)). Federal Rule of Evidence 702 controls the admissibility of expert testimony. The trial court is required to consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert

14

reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Frazier, 387 F.3d at 1260.

In United States v. Holt, we "affirmed the admission of expert testimony by law enforcement officers interpreting drug codes and jargon." 777 F.3d 1234, 1265 (11th Cir. 2015) (collecting cases). In that case, the defendant lodged a similar objection to the qualification of the government's lead agent as an expert witness offering opinion testimony about coded drug language. Id. at 1250–51. We held that the district court did not err in admitting the agent's expert testimony because the trial court found she was qualified "based on, most notably, her extensive involvement in this particular investigation . . . as well as her training, experience in previous wiretaps, and general investigative experience during her six years as a DEA Agent." Id. at 1265. The agent formed her opinions "based on her training, experience, discussions with cooperating co-conspirators, general knowledge of common drug prices and quantities, review of nearly all of the communications in this case, and the context of each particular communication." Id. at 1265–66.

So too here. Like the lead agent in Holt, agent Lee had substantial experience in narcotics investigations -- he worked in law enforcement for 19 years

15

and participated in thousands of narcotics investigations, he interviewed thousands of defendants and confidential informants, and assisted in numerous wiretap investigations which led him to review literally thousands of recorded conversations.  And like the agent in Holt, agent Lee formed his opinions using reliable methods and based on a combination of experience, general knowledge, and familiarity with the intercepted communications and their context.  Finally, Lee reviewed all of the germane conversations about the distribution of drugs drawn from the Perry wiretaps.

Perry argues, nevertheless, that agent Lee's expertise does not meet the requirements of Rule 702 because it was based solely on knowledge he gained as a case agent in this case.  Perry says that when agent Lee was asked how he determined the meaning of code words, he explained that he did so "[b]ased on the investigation that we're doing at that time and what we have learned."  But Perry cherry-picks from among many of agent Lee's statements.  Lee also testified that he had worked "almost exclusively with narcotics-related investigations" for almost twenty years, participating in "thousands" of such investigations, and that 60 to 70 percent of those investigations involved cocaine.  He explained that he developed substantial expertise in code words by conducting thousands of interviews with defendants and cooperating sources, observing that it was "through these types of information [that he had] learned some code words associated with

16

drug trafficking." Lee also testified that he stayed informed of "what people are doing in our community, what phrases they're using, the dollar amounts of purchases . . . If we're doing an investigation, we may send a text or record a conversation, so we see the actual words that they are using." Although agent Lee answered one question by focusing on his knowledge drawn from this investigation, we cannot say that it was manifestly erroneous for the trial court to qualify him as an expert on coded drug language given the entirety of his ample experience. No other challenges were raised against Lee's expertise concerning methods of trafficking and the manufacture of crack cocaine from powder cocaine.

Perry also claims that Lee's testimony invaded the province of the jury because he offered opinions about matters that went beyond his "expert" knowledge. At trial, the government used agent Lee's testimony to introduce audio recordings and transcripts of the 100 intercepted phone calls from the wiretaps of Perry and Ross. When the conversation included "code," the government would ask Lee questions about the meaning of words in the recording. The following exchange about a conversation between Perry and co-conspirator Odell Cleveland on April 13, 2013, is representative:

> Q:    And if we could scroll down just a little bit here on page one in
>        the transcript, you see there where it's entered: I got that Lulu
>        for your ass, boy? . . . Now, in the context of this conversation,
>        do you believe you understand what the word Lulu means,
>        based on your training and experience?

17

A:      Yes, ma'am. He's talking about . . . high quality cocaine.

Q:      And what is the basis for your opinion that Lulu refers to high quality cocaine?

A:      A lot of times they call powder cocaine a female, that girl, that lady, that bitch. So they're referring to a female when they refer to the powder.

It is well established that "deciphering of coded language is helpful to the jury and therefore permissible." United States v. Hawkins, 934 F.3d 1251, 1264 (11th Cir. 2019). Throughout his testimony, agent Lee offered an opinion on a variety of terms that were code words for drugs, including "lulu," "teenager," "best girl in town," "biscuit head," "something for the nose," "gator," "zip," and "zone." He also testified about the meaning of terms that referred to the quantity of drugs and their price, such as "dubs," "a G," "a little two-dollar lick," "a cookie," and a "ticket," as well as terms that referred to a drug's quality, such as "loud," "French fries," and "straight," and even terms related to drug sales, such as "coke jewel." This testimony was well within the scope of his expertise and was properly admitted. See United States v. Emmanuel, 565 F.3d 1324, 1336 (11th Cir. 2009).

In other instances, agent Lee's testimony went further, discussing the meaning of ordinary English words and phrases that came up on the tapes or offering opinions based on what certain language meant in the context of the investigation. Thus, for example, in regard to a conversation between Perry and Dexter Young on April 22, 2013:

18

Q:     Now, early on in that conversation, Agent Lee, Mr. Young makes the statement: I ain't making no money like this and you ain't either, I mean. . . . [T]ell the ladies and gentlemen of the jury what you believe that means?

A:     Again, this is referring to the two ounces that Mr. Young had purchased from Mr. Perry and where he couldn't make it -- convert it into crack cocaine like he wanted, and that's when Mr. Davenport was called over and they corrected one that we talked about earlier. And he's saying that he's not messed with the other one, so he's not being able to convert the powder into crack, so he's not making any money.

And in another instance about a call between Perry and Ross on December 16, 2013:

Q:     Mr. Ross says: Got me looking real crazy, man. Do you have an understanding of what that means?

A:     Yes, ma'am. Because his people are putting pressure on him to pay them the money. And when I'm saying "he" I'm talking about Mr. Ross -- for Mr. Ross to pay his people back their money.

Notably, Perry only objected to the scope of agent Lee's testimony one time, on the third day of his testimony,[8] in response to Lee's testimony about Ross looking "real crazy." Perry's counsel argued:

Some of this -- I know he's an expert in some of the street lingo, but some of this goes into the purview of the jury to decide what common, common phrases, common parlance means. He['s] taking away from the jury the -- interjecting his thoughts about every single word that goes beyond what his expertise is, so I would object to this.

---

[8] Lee did not testify for the entirety of each day. Lee was excused on the third day of his testimony after testifying about the Georgia wiretap and was recalled later the same day to testify about the Florida wiretap.

19

The government responded that "there's a lot of things that crazy could mean in the common parlance, but I'm asking this witness if it has a specific meaning in the drug context."  The district court overruled the objection, and instructed the jury that "certain witnesses can testify as experts, but it's for you to determine whether to accept their testimony as to what weight to give it."  Perry did not object again to the scope of Lee's testimony.

At oral argument, Perry conceded that his single objection was insufficient to preserve the issue for abuse-of-discretion review and so plain error review applies.  See Hawkins, 934 F.3d at 1264.  Plain error review affords us  "only a limited power to correct errors that were forfeited."  United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005) (internal quotation omitted).  A defendant must establish three conditions before a court may consider exercising its discretion to correct an error: "First, there must be an error that has not been intentionally relinquished or abandoned. Second, the error must be plain -- that is to say, clear or obvious. Third, the error must have affected the defendant's substantial rights." Rosales-Mireles v. United States, 138 S. Ct. 1897, 1904 (2018) (internal quotation omitted).  To establish that the error affected his substantial rights, "the defendant ordinarily must show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." Id. at 1904–05 (internal quotation omitted).  Only after all three conditions are met may the

20

court "exercise its discretion to correct the forfeited error if the error seriously affects the fairness, integrity or public reputation of judicial proceedings." Id. at 1905 (internal quotation omitted); see also Rodriguez, 398 F.3d at 1298.

Perry has failed to establish plain error. As for the first two prongs of the plain error test, we recognize that there are some parts of agent Lee's testimony that were plainly improper -- where he crossed the line from interpreting coded drug language to opining about plain language, speculating, summarizing the evidence or telling the jury what inferences to draw from the conversations. So, for example, in the conversations we just quoted, Lee erroneously translated what "real crazy" and "making no money" meant, offering opinions and summarizing the evidence in the case, instead of allowing the jury to interpret these plain-English phrases on its own. See Hawkins, 934 F.3d at 1266.

To be sure, this is not the first time a case agent has presented lay and expert "dual testimony." Our Court has long accepted the "well-established rule that an experienced narcotics agent may need to testify as an expert to help a jury understand the significance of certain conduct or methods of operation unique to the drug distribution business." United States v. Garcia, 447 F.3d 1327, 1335 (11th Cir. 2006) (internal quotation omitted). At the same time, we've cautioned about the "particular difficulties, warranting vigilance by the trial court, [that] arise when an expert, who is also the case agent, goes beyond interpreting code words

21

and summarizes his beliefs about the defendant's conduct based upon his knowledge of the case." Emmanuel, 565 F.3d at 1335 (internal quotation omitted). In those instances, where "the witness testifies as both a fact witness and an expert witness in the same trip to the witness stand," we've advised that "the government and the court must take some special precautions to make clear for the jury when the witness is relying on his expertise and when he is relying only on his personal knowledge of the case." Hawkins, 934 F.3d at 1268 (internal quotation and citations omitted). In this case, the trial court and prosecutor should have taken greater care to cabin the case agent's expert testimony to his areas of expertise and to make clear to the jury in what capacity agent Lee was testifying.

But despite the erroneous admission of this testimony, Perry has not established any plain error that affected his substantial rights -- that is, he has not met his burden of showing a reasonable probability that, but for agent Lee's challenged testimony, the outcome of the proceeding would have been different. See Rosales-Mireles, 138 S. Ct. at 1904–05. In order to establish a reasonable probability, "it is the defendant rather than the government who bears the burden of persuasion with respect to prejudice." Rodriguez, 398 F.3d at 1299 (quoting United States v. Olano, 507 U.S. 725, 734 (1993)) (cleaned up). "When an appellate court considers error that qualifies as plain, the tables are turned on demonstrating the substantiality of any effect on a defendant's rights; the defendant

22

who sat silent at trial has the burden to show that his 'substantial rights' were affected." United States v. Monroe, 353 F.3d 1346, 1354 (11th Cir. 2003) (quoting United States v. Vonn, 535 U.S. 55, 62–63 (2002)) (alteration and emphasis omitted). We have explained that this burden "is anything but easy" in order to enforce the policies that underpin Rule 52(b) generally, "to encourage timely objections and reduce wasteful reversals by demanding strenuous exertion to get relief for unpreserved error." Rodriguez, 398 F.3d at 1299 (quoting United States v. Dominguez Benitez, 542 U.S. 74, 82 (2004)). The Supreme Court has labeled this burden as "not . . . too easy for defendants." Dominguez Benitez, 542 U.S. at 82. Indeed, by objecting in a timely manner, the district court is afforded the opportunity to correct any mistake in real time.

Thus, in United States v. Emmanuel, we held that any improper testimony by a case agent did not affect the defendant's substantial rights. The defendant Shervin Emmanuel was arrested and convicted of conspiring to import cocaine into the United States, attempting to import cocaine into the United States, possessing with intent to distribute cocaine while on board a vessel of the United States, and two counts of importing cocaine into the United States. 565 F.3d at 1329. He appealed his convictions, arguing, in part, that there was insufficient evidence to support his conviction and that the district court should have excluded opinion testimony regarding the meaning of some of the intercepted phone calls. Id. at

1330. As for the sufficiency argument, we explained that the "primary evidence of Emmanuel's participation" in the conspiracy "was his own incriminating conversations." Id. at 1333. As we noted, "Emmanuel discussed drug payments, plans to ship large amounts of cocaine to Florida, the availability of drug smuggling ships, and security for the smuggling operations," which was "corroborated by seizures of drugs and drug money." Id. Further, there was also testimony from co-conspirators about Emmanuel. Id.

Turning to the opinion testimony of the case agent, Sergeant Wayne Woodside, we noted that Woodside was offered as an expert in interpreting drug codes and jargon used during the intercepted calls. Id. at 1335. We explained that "[m]ost of Sergeant Woodside's testimony was specific and closely related to his interpretation of drug codes and jargon," which was properly admitted. Id. at 1336. For example, he properly interpreted the following code words:

> "two dollars" means $2,000; "D Boys" means agents from the Drug Enforcement Administration; "scanner" means wiretap; "movements" means law enforcement activities; "girls" means cocaine; "pouring that concrete" means exchange of the cocaine; "a check for $300" means 300 kilos of cocaine; and "for them to find the girls with this guy, they got to pick him out of the water, and, you know, and cut" means they have to take the boat out of the water and cut it up to find the cocaine.

Id. Although we found that some of Sergeant Woodside's testimony was not specific to his expertise, we held that any such testimony did not affect Emmanuel's substantial rights because of the district court's instruction to the jury

24

to determine "whether the testimony is credible," as well as the fact that the primary evidence against Emmanuel were the intercepted calls.  As we explained,

> Even if none of Sergeant Woodside's expert testimony was admissible, the jury could have easily interpreted the recorded conversations as involving drugs based on other evidence in the case, including actual seizures of drugs and drug money and testimony from coconspirators. Considering the substantial evidence against Emmanuel, Sergeant Woodside's opinion testimony that went beyond interpreting drug codes and jargon was merely cumulative and was not essential to the jury's verdict.

Id.

By contrast, in United States v. Hawkins, a panel of this Court vacated the convictions of defendants James Hawkins and Wallace McCree for conspiracy to distribute cocaine and related offenses because the government's chief investigator was offered and admitted as an expert in drug code words, but his testimony included summaries of evidence, interpretations of plain language, and inferences drawn from the evidence.  934 F.3d at 1264–69.  The investigator was "the principal prosecution witness" and testified for more than half of the trial.  Id. at 1267.  The panel also stressed that the investigator was the only witness who testified about Hawkins, and that without the investigator's testimony, "there would not have been sufficient evidence to convict Hawkins on any of the counts against him."  Id.  The panel concluded, there could "be no doubt that [the investigator's] improper testimony affected the outcome of the trial."  Id.  The Hawkins panel did not discuss the tapes themselves in any detail, leaving us

25

without any insight as to why they were not evidence of Hawkins's guilt in their own right. Thus, the government's case turned exclusively on the investigator's improper testimony.

We begin with the obvious: "each case must be decided on its own facts." United States v. Smith, 967 F.3d 1196, 1208 (11th Cir. 2020) (quoting United States v. Carcione, 272 F.3d 1297, 1301 n.6 (11th Cir. 2001)); see also Ker v. California, 374 U.S. 23, 33 (1963) ("Each case is to be decided on its own facts and circumstance.") (internal quotation omitted); United States v. Rogers, 701 F.2d 871, 874 n.3 (11th Cir. 1983) (same). This is especially true for plain error review, which "depends upon the particular facts and circumstances of each case." United States v. Duke, 527 F.2d 386, 391 (5th Cir. 1976); see also Lloyd v. United States, 412 F.2d 1084, 1087 (5th Cir. 1969) ("This being the case, we cannot hold, in the particular circumstances of this case, that the Court's instructions regarding the statutory inference [were] plain error.").[9] Neither the panel in Emmanuel nor the one in Hawkins faced the same set of facts we face today. However, a thorough review of the ample record here leads us to the conclusion that this case is more similar to Emmanuel than Hawkins.

---

[9] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

For one thing, just as in <u>Emmanuel</u>, the district court instructed the jury -- on multiple occasions -- about how it could evaluate agent Lee's opinion testimony. The first instruction was given on the second day of trial after the government tendered agent Lee as an expert witness. The court explained that "with regard to all witnesses, an expert witness, as with any other witness, it's up to you to determine what credibility or weight to give to a witness's testimony." Next, the court repeated this instruction after Perry's attorney objected to agent Lee's testimony as invading the province of the jury. In overruling the objection, the court explained that "certain witnesses can testify as experts, but it's for you to determine whether to accept their testimony as to what weight to give it. So you are able to evaluate that as to whether it satisfies you or whether there's other reasons that you cannot." Finally, the court gave the instruction anew as part of the closing instructions. It began with instructions about the treatment of testimony generally: "Now, in saying that you must consider all of the evidence, I do not mean that you must accept all of the evidence as true or accurate. You should decide whether you believe what each witness had to say and how important that testimony was." Then, the court instructed the jury on the treatment of expert testimony specifically:

> When a scientific, technical, or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter.

27

> However, that does not mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon that opinion.

The jury was reminded of its ability to critically assess the expert testimony by the defense counsel as well. These instructions clearly informed the jury that agent Lee's testimony need not be accepted. Emmanuel, 565 F.3d at 1336.

The intercepted calls -- all 100 of them -- were appropriately admitted into the record for the jury to consider; indeed, they formed the guts of the prosecution's case, along with the other evidence presented at trial. See id. at 1336. These intercepted phone calls included recordings of Perry himself offering a man "the best girl in town"; discussing "that Lulu" with co-conspirator Odell Cleveland; telling Dexter Young that he would send someone to help "wash one of them dogs"; sending Davenport to go "get that thang to do what it wanted to do" in exchange for $50; negotiating the price for "something for the nose" with two potential customers; agreeing to give his son "one of them balls" for his "little coke jewel"; offering "two balls" for resale; discussing "real biscuit heads" with his brother; pitching "3 big girls" to a potential customer; straightening out underweight sales for dissatisfied customers; and discussing sales, collecting money, and "putting that tape" around something for his Miami supplier, Ross.

The jury was readily able to infer from these conversations that Perry was engaged in one or more illicit drug transactions. Many of them used code words

28

for drugs, but others explicitly referred to drugs.  As we've already noted, on one occasion co-conspirator Brandon Perry told Eddie Lee Perry about his "little coke jewel."  On another occasion, Perry discussed the price of the product "if he's just gonn[a] use it for the nose," a phrase that was repeated in another call by a customer who asked Perry for "something for the nose."  And in still another conversation Davenport told Perry he had been in a car with "three halves and . . . some powder."  The jury didn't need agent Lee to translate those words because they were not coded nor inferential.  A "little coke jewel" left little for the jury to speculate about, as did Perry's observation that he was "gonn[a] use it for the nose."  And Davenport's reference to "some powder" being found in Washington's car also left little to the imagination.  The jury surely could infer that these references to "coke," to "powder," and to something to be used "in the nose" did not refer to baking soda, sugar, cosmetics, or a nasal spray.  Even Perry appears to accept -- or at least not dispute -- that most of the recorded cell phone calls were properly introduced into evidence.  Perry has not begun to explain, much less meet his burden to show, how the language in the phone calls did not give the jury a sufficient basis to find, beyond a reasonable doubt, that he knowingly and willfully participated in the charged narcotics conspiracy.

And, importantly, the phone calls are not the only evidence establishing a broad narcotics conspiracy in this record.  Just as in Emmanuel, Perry's intercepted

29

phone calls were "corroborated by seizures of drugs and drug money." Emmanuel, 565 F.3d at 1333. Among other things, the government specifically tied many of the intercepted calls involving Perry and the other co-conspirators to extrinsic evidence seized during three separate drug transactions -- physical evidence that Perry has not sought to exclude. In the process, the government has substantially corroborated that the intercepted phone calls involved discussions about the narcotics transactions charged in the multi-count indictment.

For one thing, the government introduced calls from May 2013 between Perry and co-conspirator Davenport about getting in touch with Vert Washington and purchasing cocaine for resale from him in the immediate days before the seizure of 6.59 grams of crack cocaine and less than a gram of powder cocaine from Washington's car on May 16. The government connected this event to a call between co-conspirators Perry and Davenport on May 17, the day after the seizure, in which they discussed the lost cocaine. Davenport explained that he and Washington were stopped by the police and he referenced that "three halves and . . . some powder" were taken from the car.

The jury was also presented with numerous other calls between Davenport and Perry in which the two used coded language such as "jumping out the pot" and "ha[ving] one off in the mug" and several numbers. The jury would have recognized from agent Lee's expert testimony that these terms related to the

30

production of crack cocaine. Although these calls did not relate to the incident with Vert Washington, they also illuminate the involvement of Davenport and Eddie Lee Perry in the production and distribution of crack cocaine. The jury could readily find that Davenport and Perry were not just some unlucky bystanders to the seizure of drugs from Washington's car.

Second, and wholly distinct from the first extrinsic act, the government introduced two calls between Perry and Darnel Anderson, also from May 2013, when Anderson requested a delivery from Perry, and tied these calls to Perry's visit to Anderson at a car wash in Cairo. As officer Pearson testified, Perry met with Darnel Anderson "just moments" before other officers arrived to arrest Anderson and subsequently seized almost 100 grams of crack cocaine from Anderson after he fled the car wash.

Third, the prosecution introduced several other calls several months later (in December 2013) between Perry and Ross when they discussed Perry's efforts to repay Ross for drugs he had been supplied. Thus, for example, in one call on December 22, 2013, Ross told Perry that Ragin was on his way to collect the money, and Perry told Ross that he was "putting that tape around" it. Officer Pearson and officer Bruce Womble both testified that on December 22, they saw Ragin's car parked in front of Perry's home. Thereafter, again on the same day, Ragin was stopped by the police on his way back to Florida carrying $18,870 in

31

cash wrapped together in tape in his car, and an additional $840 in cash on his person.[10]  The government also introduced intercepted phone calls between Ragin and Ross after Ragin was stopped by the police, calls in which Ragin and Ross discussed false exculpatory explanations for why Ragin was carrying so much cash.  Moreover, Ragin told Ross that "they watching that . . . house," referring to Perry's house where the two men had met earlier that day.  The next day, Ross called Perry back to describe the cash seizure and warn Perry to "keep [his] eyes open" and "look[] out."

By tying Perry's own phone calls to the arrests of some of his co-conspirators and to the seizure of money and drugs from some of them, the government supplied ample corroborative evidence that Perry was a knowing and willful participant in the drug conspiracy.  No such corroborative evidence apparently existed in Hawkins.

Still further, the government introduced relevant 404(b) evidence -- completely independent of agent Lee's opinion testimony -- that Perry had previously been involved in a multi-year cocaine trafficking operation in the same geographic area as the events that transpired in this case.  The stipulation was read to the jury and explained that, for some eight years and three months (from on or about January 1, 1996 to April 3, 2004), Perry had been involved in distributing

---

[10] Agent Lee testified that in 2013, a kilo of powder cocaine was worth $36,000 to $38,000.

multi-ounce quantities of crack cocaine in the Cairo, Georgia area.  The stipulation also described the controlled buy of powder and crack cocaine by an officer from Perry.

This was powerful evidence for the jury to consider as evidence of Perry's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  Perry pleaded not guilty to the conspiracy charge in this case and a "defendant who enters a not guilty plea makes intent a material issue which imposes a substantial burden on the government to prove intent, which it may prove by qualifying Rule 404(b) evidence."  United States v. Edouard, 485 F.3d 1324, 1345 (11th Cir. 2007); see also United States v. Barrington, 648 F.3d 1178, 1186 (11th Cir. 2011).  When "extrinsic act evidence is offered to prove intent, 'its relevance is determined by comparing the defendant's state of mind in perpetrating both the extrinsic and charged offenses.'"  Barrington, 648 F.3d at 1186 (citation omitted).  Here, the 404(b) evidence was relevant to the conspiracy case as the government alleged that Perry was again knowingly and willfully involved in a multi-year conspiracy to distribute cocaine.  No such 404(b) evidence was presented in the Hawkins case.

United States v. Ramirez, 426 F.3d 1344 (11th Cir. 2005) is illustrative of how 404(b) evidence may provide such a supportive function.  In Ramirez, the defendant was convicted of conspiracy to possess with intent to distribute cocaine

33

after being arrested by the United States Navy in a flagless, go-fast boat off the coast of Colombia.  Id. at 1348.  On appeal, the defendant challenged the admission of evidence related to his prior arrest, which occurred "in connection with an incident involving a stranded, flagless, go-fast boat off the coast of Colombia with four other crewmen and a substantial  amount of cocaine floating in the water."  Id.  We rejected his argument that the 404(b) evidence was improperly admitted: "Although the presence of [the defendant] and one of his codefendants in the same place at the same time under similar circumstances in 2000 does not conclusively establish that they met, the evidence makes such a meeting appear more probable."  Id. at 1354.  The 404(b) evidence was probative of the defendant's "criminal intent because it makes it appear more probable that he knew of the object of the charged conspiracy."  Id.  As we noted, "[t]he similarity of circumstances in which [the defendant] found himself, apprehended off the Colombian coast in a flagless, go-fast boat surrounded by large quantities of cocaine is highly probative of his criminal intent."  Id.  We further explained that a "similarity between the other act and a charged offense will make the other offense highly probative with regard to a defendant's intent in the charged offense."  Id.

Here too, there is a "similarity of circumstances" between Perry's earlier involvement in a multi-year drug distribution scheme and Perry's frequent conversations with co-conspirators who were tied to crack cocaine or large sums of

cash.  All of this evidence bore on Perry's intent.  It surely was not lost on the jury that Perry had taken part, for a very extended period of time, in illegal drug transactions involving the same controlled substances and in the same geographic area.  The jury could properly determine, in light of the 404(b) evidence, that Perry did not accidentally happen to regularly speak and interact with the co-conspirators involved in the extrinsic events, but was instead a knowing player.

In short, there was more than enough evidence here to convict Perry of the charged crimes without consideration of any of the improper opinion testimony taken from agent Lee.  Perry argues nevertheless that agent Lee's testimony "was the only evidence the[ jury] had," but this ignores the independent corpus of evidence, which included the extensive raw audio tracks (and transcripts of those recorded conversations) setting forth the nature and extent of the elaborate narcotics conspiracy, the seizures of drugs and money from co-conspirators who contemporaneously interacted with Perry and later discussed those seizures with him, and Perry's criminal history involving similar drug offenses.  Further, under our analysis in Emmanuel, we may consider agent Lee's proper testimony -- including his translations of the coded language in the conversations -- which provides substantial evidence of Perry's involvement in the drug crimes. Emmanuel, 565 F.3d at 1336.  Indeed, Perry makes no argument that agent Lee misapprehended the coded language repeatedly used in many phone calls and says

35

nothing at all about the explicit references in the taped conversations to "coke jewel," "powder," and something "for the nose." Thus, considering this entire record, the jury could reasonably infer that the coded conversations involved illicit drug agreements and that, beyond a reasonable doubt, Perry was guilty of the various drug offenses.

Faced with this evidential foundation, Perry has done little to refute the conclusion (as he must) that there is a reasonable probability that, absent agent Lee's challenged testimony, the outcome would have been different. In other words, he has not convinced us that a substantial uncertainty exists, and, in any event, "[u]ncertainty works against reversal." United States v. Iriele, 977 F.3d 1155, 1177 (11th Cir. 2020). To put it simply, Perry must make "a specific showing of prejudice," Olano, 507 U.S. at 735, but he has failed to do so by not addressing the entire corpus of evidence, much less explaining how the remaining record evidence was somehow insufficient to convict him. Because Perry has not met his "heavy" burden, he has not established plain error. See United States v. Rodriguez, 627 F.3d 1372, 1382 (11th Cir. 2020).

Moreover, Perry has not met (as he must) the final condition of plain error review, which requires a showing that the error seriously affected the fairness, integrity, or public reputation of judicial proceedings such that we should exercise our discretion to correct it. See Iriele, 977 F.3d at 1180; United States v.

Hernandez, 906 F.3d 1367, 1370 (11th Cir. 2018).  This too is "a case-specific and fact-intensive inquiry," and may involve a determination of "the amount of evidence incriminating the defendant, regardless of the error."  Hawkins, 934 F.3d at 1267–68 (internal quotation omitted).  Indeed, the purpose of this final element "is to analyze whether a reasonable citizen would bear a rightly diminished view of the judicial process and its integrity if the court refused to correct the alleged error."  Id. at 1268 (cleaned up and internal quotation omitted).

We are not convinced that a reasonable citizen would be so disappointed here.  As we've detailed at length, there was sufficient evidence of Perry's knowing and willful involvement in a long-term drug conspiracy without any reference to Lee's improper testimony.  See Emmanuel, 565 F.3d at 1336.  It's also worth noting that Perry easily could have avoided his current predicament by making specific objections to put the trial court on notice of any problematic testimony, as one regularly does during a trial, and thereby afford the court an opportunity to correct any error in a timely fashion.  Instead, we find ourselves in a situation where there was more than enough evidence to convict the defendant of the charged drug conspiracy, yet the defendant asks us now -- at the tail end of a long day -- to overturn his verdict by challenging some of the very evidence that he passively listened to and that supported the already-fulsome record against him.  As we see it, the public's view of the judicial process is served best in this case by

37

recognizing the strength of the evidence before us and upholding the jury's verdict. We do not encounter a defendant's single malfeasance, misinterpreted signal, or fabricated scheme. Rather, there are roughly 100 phone calls that demonstrate Perry's planning of and participation in a cocaine conspiracy that spanned several years and involved many co-conspirators. All of this is to say that Perry's challenge to some of agent Lee's testimony "has not undermined our confidence in the outcome" of his trial, and we decline to exercise our discretion to recognize the error in this case. Iriele, 977 F.3d at 1180; see also Olano, 507 U.S. at 736 (directing courts of appeal to exercise their discretion under the fourth condition of plain error review when the challenged error represents a "miscarriage of justice"). There was no miscarriage of justice in this case.

We do not reach this conclusion lightly. We recognize the dangers our Court identified in Hawkins that can result from the admission of impermissible opinion testimony, including that

> it confers upon the agent an aura of special reliability and trustworthiness; that the agent could stray from applying reliable methodology and convey to the jury the witness's sweeping conclusions about appellants' activities; and that the jury could conflate the witness's expert and fact witness testimony. And as noted in Emmanuel, such expert testimony may unfairly provide the government with an additional summation by having the expert interpret the evidence, and may come dangerously close to invading the province of the jury.

Hawkins, 934 F.3d at 1266 (internal quotation and citations omitted).  We repeat that the trial court must carefully perform its gatekeeping function in evaluating the admissibility of an expert's opinion testimony.  We underscore, however, that it remains the duty of litigators to object contemporaneously when offending testimony is offered so that the trial court will have the opportunity to exercise its critical gatekeeping function when it matters most.  Plainly, Perry failed to do so in this case and he has not satisfied the demanding burden inherent in plain error review.

B.

Perry's other arguments similarly do not warrant reversing his convictions.  Perry claims that the district court abused its discretion by admitting recordings of cellular phone calls, which included out-of-court statements made by third parties who were not called to testify at trial.  When the government offered the tapes into evidence, Perry's counsel objected, only at the highest order of generality, that some of the admitted calls involved "parties who are not here," and that this created a hearsay problem.  The district court explained that the parties were required to object when the conversations "specifically arise for presentation."

Later in the trial, however, Perry only objected to the government's introduction of one phone call between Perry and Dexter Young on April 18, 2013, when Young stated that "he's having problems washing his dogs."  Agent Lee

39

interpreted this comment to mean that Young was having a problem converting powder cocaine into crack cocaine. The government argued that the comment was not hearsay because Perry participated in the conversation. The district court agreed. Again, we review evidentiary rulings for abuse of discretion. United States v. Joseph, 978 F.3d 1251, 1263 n.12 (11th Cir. 2020).

In United States v. Rivera, 780 F.3d 1084, 1087 (11th Cir. 2015), a defendant challenged the admission of tape-recorded conversations between himself and a third party. We rejected the challenge, explaining that the hearsay rule "does not operate to exclude, wholesale, remarks made by another participant to the conversation, merely because those remarks occurred outside the courtroom." Id. at 1092. If it did, "it would mean that, except for the criminal defendant against whom the statements are being admitted, the voice of any other participant to the taped conversation would have to be removed." Id. at 1091. The jury would hear "only a soliloquy by the defendant, with no knowledge of the substance of any comments by others to whom the defendant was responding." Id. Unable to learn the context of a defendant's comments would generally leave the jury unable "to make much sense of a defendant's statements." Id.

Here, Perry concedes (as he must) that his own statements in the recordings were admissible under Federal Rule of Evidence 801(d)(2)(A) as statements of a party-opponent. And, just as in Rivera, we cannot say that Young's statements

40

ought to have been removed.  For one thing, the inclusion of Young's statements was necessary for the jury to fully understand Perry's statements.  Id. at 1092–93.  Put another way, Young's statements did not amount to hearsay.  "Generally, an out-of-court statement admitted to show its effect on the hearer is not hearsay."  Id. at 1092 (citing United States v. Cruz, 805 F.2d 1464, 1478 (11th Cir. 1986)).  "Likewise, out-of-court declarations that are more in the nature of an order or a request and that, to a large degree, are not even capable of being true or false are also not hearsay."  Id. (internal quotation omitted and alteration accepted).  In the call Perry objected to, Young made two requests for Perry's assistance: "I was going [to] ask ya . . . you know the dude I mean you know the people you be getting to wash your dogs for you," and "I was gonna see could uh could they do one for me man cause I tried to wash one of them dogs last night man I couldn't do nothing with that dog man."  Young made two additional comments in the same phone call about his difficulties "wash[ing] that dog."  These statements were offered to show their effect on Perry, who told Young he would send help Young's way: "I'll hit him and tell him to swing your way I'll tell him to give you a call know what I'm saying."  Without hearing Young's side of the conversation, Perry's statements would have been rendered meaningless.

For the first time on appeal, Perry also objects to 50 additional conversations that were received into evidence, including others that involved Young.  Perry

41

claims that it was not necessary for defense counsel to make the same objection to the remaining conversations because the court had already made its ruling about one of them. We disagree. We repeat that Perry was required to raise specific objections to specific questions and specific answers as they were offered, and, by failing to do so, we are left to review the remainder of the phone calls only for plain error. United States v. Melgen, 967 F.3d 1250, 1260 (11th Cir. 2020). Moreover, even on appeal, Perry has lodged only a blanket objection to these calls, again only arguing at the highest order of abstraction, and without showing how the third-party statements were hearsay, how they may have affected his substantial rights, or how all of this might have affected the fairness of his trial. This does not establish plain error, and it remains his burden to do so. Among other things, it is not at all apparent to us how these offered statements amounted to hearsay or ultimately, how the outcome of the trial would have been different if portions of these calls had been redacted. We can find no plain error in the admissibility of the third-party statements in these intercepted phone calls.

Perry also argues that the district court erred by admitting under Rule 404(b) any evidence of the factual circumstances surrounding Perry's prior federal conviction for conspiring to possess with intent to distribute cocaine. We review the admission of 404(b) evidence for abuse of discretion. United States v. Green, 873 F.3d 846, 857 (11th Cir. 2017).

42

As we've seen, the proffered Rule 404(b) evidence against Perry arose from a 2005 guilty plea entered in the federal district court in the Middle District of Georgia. Perry admitted to conspiring to possess with intent to distribute cocaine and stipulated that he had been involved in the distribution of crack and powder cocaine in the Cairo, Georgia area from 1996 through 2004. The government moved to introduce the underlying facts supporting this conviction in order to establish Perry's intent in this case. The district court concluded that the probative value of the evidence was not outweighed by the danger of unfair prejudice. But in order to limit any perceived prejudice, the court directed the parties to limit the admitted statement.

Rule 404(b) provides that evidence of prior crimes, wrongs, or acts may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). We have long employed a three-part test to determine admissibility. First, "the evidence must be relevant to an issue other than the defendant's character"; second, "the act must be established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act"; and finally, "the probative value of the evidence must not be substantially outweighed by its undue prejudice." Holt, 777 F.3d at 1266 (quoting United States v. McNair, 605 F.3d 1152, 1203 (11th Cir.

2010)); see also United States v. Jernigan, 341 F.3d 1273, 1280 (11th Cir. 2003). Perry's argument on appeal focuses exclusively on the third requirement.

As we have previously explained, "a not guilty plea in a drug conspiracy case makes intent a material issue and opens the door to admission of prior drug-related offenses as highly probative, and not overly prejudicial, evidence of a defendant's intent." Holt, 777 F.3d at 1266 (quoting United States v. Smith, 741 F.3d 1211, 1225 (11th Cir. 2013)). Perry concedes as much, but then argues that his case is different because of the quantity of drugs involved and the length of time mentioned in the stipulation. However, Perry does not point to any case law or offer any persuasive reason why these facts would be unduly prejudicial. Indeed, the similarities between the facts surrounding the prior conviction and the conspiracy charge in this case arguably make it highly probative. See Ramirez, 426 F.3d at 1354.

Perry also argues that the stipulation included "extraneous facts," which were not part of the government's theory in this case. Thus, for example, the stipulation informed the jury that Perry kept drug paraphernalia, such as baggies and a scale, while no such paraphernalia was recovered from Perry in this case. Perry says that this posed a risk of "undue confusion." However, we cannot say that the trial court abused its considerable discretion in concluding that the any risk of undue prejudice outweighed the probative value of the evidence. Furthermore,

44

any risk of undue prejudice was reduced by the redaction of any reference in the stipulation to Perry's actual conviction or his guilty plea.  Also removed from the stipulation of facts was the observation that Eddie Lee Perry was an organizer, leader, or supervisor of the criminal activities and that Perry's co-conspirator and co-defendant, Joseph Davenport, was also involved.

Finally, the district court gave the jury repeated limiting instructions about the proper way to consider 404(b) evidence, which further reduced the risk of undue prejudice.[11]  See Ramirez, 426 F.3d at 1354.  The court gave a limiting instruction both before reading the stipulation and after.  It also gave the jury a limiting instruction at the close of the case.  The court explained:

> During the trial you heard evidence of acts allegedly done by the defendant on other occasions that may be similar to acts the defendant is currently charged with.  You must not consider any such evidence to decide whether the defendant committed the acts charged now, but you may consider this evidence for other limited purposes.
>
> If other evidence leads you to decide beyond a reasonable doubt that the defendant committed the charged acts, you may consider evidence of similar acts done on other occasions to decide whether the defendant had the . . . state of mind or intent necessary for the crime charged, acted according to a plan, or to prepare to commit a crime, or committed the charged acts by accident or mistake.

---

[11] The jury heard this limiting instruction again when the government introduced the 404(b) evidence against Ragin.  The district court acknowledged that the jury had heard the instruction before, explaining that "I don't want to appear to be repetitive, members of the jury, but it's important that you understand," and went on to repeat the limiting instruction and explain the reasons behind it.  We are confident that the jury was informed and understood how to properly consider the stipulation.

> With respect to any evidence presented alleging a defendant committed other crime, wrongs, or acts on an occasion not charged in the indictment, you are instructed that to the extent, if any, you find such evidence -- rather, that you find such crimes, wrongs, or acts established by the evidence you may consider such other evidence only as to that defendant.

Perry does not argue that these instructions were inaccurate or insufficient in any way, and they were not. We presume that jurors follow the instructions given by the district court. United States v. Almanzar, 634 F.3d 1214, 1222 (11th Cir. 2011). On this record, the district court did not abuse its discretion admitting some of the facts surrounding Perry's prior drug conviction.

## III.

Ragin raises two claims on appeal,[12] neither of which warrant reversal. First, Ragin argues that the district court should not have considered the drugs and

---

[12] In Ragin's opening brief, he also claims to adopt "the issues and arguments, and citations to the record of his co-defendants and co-appellants." However, this statement is inadequate to adopt Perry's arguments on appeal in this case. Eleventh Circuit rules provide that a party may adopt by reference any part of the brief of another party pursuant to Federal Rule of Civil Procedure 28(i) by "includ[ing] a statement describing in detail which briefs and which portions of those briefs are adopted." 11th Cir. R. 28-1(f). Ragin's blanket statement of adoption does not do so. Nor could it -- Ragin's brief was filed in August 2017, almost two years before Perry's brief. Moreover, Perry's arguments on appeal -- concerning how the admission of agent Lee's testimony, of telephone call transcripts, and of Perry's Rule 404(b) evidence affected Perry's convictions -- are all specific to Perry's case on appeal, and we cannot resolve them without Ragin explaining how those issues would apply to him. See United States v. Khoury, 901 F.2d 948, 963 n.13 (11th Cir.), opinion modified on denial of reh'g, 910 F.2d 713 (11th Cir. 1990) (holding that one party cannot adopt the arguments of another party on appeal when the "the fact-specific nature of [the argument on appeal] requires independent briefing if we are to reach the merits"). Therefore, we construe Ragin's brief as having addressed only those issues that he independently raised.

firearms found in his residence during his arrest on September 23, 2014, as

"relevant conduct" during sentencing.  He claims that because his arrest fell

outside the timeline detailed in the indictment (which charged a conspiracy

beginning on or about January 1, 2010, and continuing until on or about December

31, 2013), and because the details of the arrest were admitted only as 404(b)

evidence at trial, the district court should not have taken it into consideration when

calculating his Guidelines sentencing range.  The district court found Ragin had a

total offense level of 34, which included the drugs recovered from his home and a

two-level enhancement for possession of a firearm.

We review the district court's factual findings about relevant conduct only

for clear error.[13]  United States v. Maddox, 803 F.3d 1215, 1220 (11th Cir. 2015).

"We will reverse only if we find that the district court clearly erred in considering

as part of the same course of conduct or part of a common scheme or plan as the

---

[13] The government argues that the two aspects of the 404(b) evidence -- the drugs and the firearms -- must be reviewed separately because Ragin did not object to the district court's application of the two-level enhancement for possessing dangerous weapons.  At the sentencing hearing, Ragin objected to the district court's consideration of "the drugs that were found at his house" as relevant conduct.  Although Ragin did not object specifically to the firearms, the government brought them to the court's attention, explaining: "[T]he firearms were located at the same time as these quantities of narcotics in September of 2014.  So although nobody stated that specifically, I think that if the Court were to find that those contents of the residence were not properly to be considered, that might also impact the two points for the gun."  We review an "unpreserved error for plain error when the defendant has failed to preserve the issue by unambiguously flagging the mistake and contemporaneously objecting."  United States v. Margarita Garcia, 906 F.3d 1255, 1263 (11th Cir. 2018).  Ragin's objection to the evidence related to his 2014 arrest, and the government's clarification that the guns were part of that evidence, mean the issue was "unambiguously flagg[ed]" for the district court to consider.  Id.

47

count of conviction conduct which exists in discrete, identifiable units apart from the offense of conviction." United States v. Maxwell, 34 F.3d 1006, 1011 (11th Cir. 1994) (internal quotation omitted).

At sentencing, the district court will calculate a defendant's total offense level by considering "all relevant conduct attributable to the defendant." Maddox, 803 F.3d at 1221. Under section 1B1.3 of the Sentencing Guidelines, relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" -- as well as all "reasonably foreseeable" acts and omissions of others "in furtherance of" jointly undertaken criminal activity -- "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(1), (2); see also id. § 1B1.3, cmt. n.3. "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." Id. § 1B1.3, cmt. n.5(B)(i).

Moreover, the district court must consider whether "there are distinctive similarities between the offense of conviction and the remote conduct that signal that they are part of a single course of conduct rather than isolated, unrelated events that happen only to be similar in kind." United States v. Siegelman, 786

48

F.3d 1322, 1333 (11th Cir. 2015) (quoting United States v. Valladares, 544 F.3d 1257, 1268 (11th Cir. 2008)).  Relevant conduct need not be included in the indictment -- a district court may consider uncharged conduct if it finds that the government proved the conduct by a preponderance of the evidence.  See United States v. Culver, 598 F.3d 740, 752 (11th Cir. 2010); United States v. Hamaker, 455 F.3d 1316, 1336 (11th Cir. 2006).

Here, the district court properly considered the drugs and firearms found at Ragin's residence during his arrest.  At trial, the officer who searched Ragin's residence testified about the discovery of drugs and firearms.  The district court also admitted Ragin's statement taken after his arrest that the drugs belonged to Ross; that Ross paid him to keep them; and that he had been doing so for several months.  Ragin's admission, which was properly admitted into evidence,[14] established a common accomplice, Roger Ross, between the events underlying Ragin's conspiracy conviction and the drugs found during his arrest.

Further, the district court could find a common purpose between the events surrounding the conspiracy and Ragin's possession of the drugs and firearms.  As proven at trial, Ragin acted as a courier of drugs and money between co-conspirators Ross and Perry.  The district court did not clearly err in finding that

---

[14] Ragin does not challenge the admission of the statement as 404(b) evidence at trial.

49

storing drugs and firearms for Ross more than nine months[15] after the end of the

charged conspiracy was part of "a single course of conduct" with the events

charged in the conspiracy.  See Siegelman, 786 F.3d at 1333 (internal quotation

omitted).  And as the district court pointed out, there was no evidence that the

conspiracy ended on December 31, 2013 -- the end of the charged period -- nor

that Ragin affirmatively withdrew from the conspiracy.  As the government

explained at sentencing, December 2013 "was just the last date upon which [it] had

evidence at the time [it] went to the grand jury."  Because the district court found

that the drugs and firearms were part of a single course of conduct and were not an

isolated, unrelated event, it did not err when it concluded that they were relevant

for the purposes of determining Ragin's proper Guidelines range.

Second, Ragin argues that the district court erred by not sua sponte granting

him a two-level minor-role reduction.  Because Ragin did not raise this issue at

sentencing, we review it only for plain error.  Margarita Garcia, 906 F.3d at 1263;

see also Rodriguez, 398 F.3d at 1298.  Ragin bears the burden of establishing his

minor role in the offense by a preponderance of the evidence.  United States v.

Bernal-Benitez, 594 F.3d 1303, 1320 (11th Cir. 2010).  The Sentencing Guidelines

allow for an adjustment for "the role the defendant played in committing the

---

[15] Ragin's post-arrest statement said that he had "been keeping cocaine and heroin at [his] house for Roger Ross for about two or three months."  Therefore, the conduct arguably began even closer in time to the charged conspiracy.

offense." U.S.S.G. Ch. 3, Pt. B, intro. cmt. A two-level downward adjustment is warranted when "the defendant was a minor participant in any criminal activity." U.S.S.G. § 3B1.2. The commentary explains that the adjustment is available "for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." Id. cmt. n.3(A).

Although Ragin argues that he was merely a courier, that observation is not dispositive in deciding whether he is entitled to a downward adjustment. In United States v. Rodriguez De Varon, 175 F.3d 930, 940 (11th Cir. 1999) (en banc), we instructed the district court to consider "first, the defendant's role in the relevant conduct for which [he] has been held accountable at sentencing, and, second, [his] role as compared to that of other participants in [his] relevant conduct." In examining the first prong, we explained that "where the relevant conduct attributed to a defendant is identical to [his] actual conduct, []he cannot prove that []he is entitled to a minor role adjustment simply by pointing to some broader criminal scheme in which []he was a minor participant but for which []he was not held accountable." Id. at 941.

That is exactly what Ragin asks us to do here. The district court calculated Ragin's sentence based on his actual conduct -- the cocaine he personally delivered to Perry from Ross and the drugs he admitted to holding for Ross. The court excluded from consideration any cocaine delivered by the other conspirators.

51

Although Ragin points to the broader criminal scheme between Perry and Ross and the others, that alone is insufficient to justify a downward adjustment when the district court determined his sentence by zeroing in on his actual conduct alone. Nor is it clear that Ragin was "less culpable" than the average participant in this conspiracy, given his role as a courier of drugs and money for Perry and Ross. Ragin has not met his burden of establishing his minor role, nor that the district court plainly erred by not <u>sua sponte</u> granting him a downward adjustment.

Accordingly, we AFFIRM Perry's convictions and Ragin's sentence.